### Bozarth v. Banister, et al.

(Decided May 4, 1911.)

Appeal from Lyon Circuit Court.

Fraudulent Conveyance—Slight evidence of undu e influence and mental incapacity will be sufficient to authorize the chancellor to set aside an unnatural and unreasonable conveyance made by a fath er in which he gave without adequate consideration to one of his two chilaren his entire estate.

NEWTON W. UTLEY for appellant.

E. H. JAMES and WM. MARBLE for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

In this controversy the appellant seeks to set aside upon the grounds of mental incapacity and undue influence a deed made by F. G. Banister to the appellees. The lower court dismissed the petition, and she appeals.

F. G. Banister, the father of appellant and the father-in-law of appellee Ruth Banister, died in June, 1909, leaving surviving him as his only heirs at law the ap-

pellant and her brother the appellee W. H. Banister, who is the husband of the appellee Ruth Banister. F. G. Banister had two children besides the appellant and the appellee. His son Woodson died childless in 1895, and his daughter died unmarried in March, 1906. His wife died in 1907. Sometime in 1891 the appellee W. H. Banister married and moved from Lyon county, where his father lived, to Muhlenburg county; but, about the time Woodson died, he returned to his father's farm in Lyon county and has continued to live there. When he and his wife returned from Muhlenburg Co. they lived for nine months with his father, F. G. Banister, and then moved into a house nearby, where they lived until Nannie's death in 1906. After she died, they moved into the house his father lived in and have since continued to reside there.

In 1898 the appellant married John Bozarth, who died in 1909. After the marriage, she left her father's home and did not thereafter live with him or his family. Her father was bitterly opposed to the marriage, and was never on friendly terms with Bozarth; but his daughter after her marriage occasionally visited her father, as he did her.

In October, 1906, F. G. Banister and his wife conveyed the home farm, containing 200 acres, and which is the land now in controversy, to the appellee W. H. Banister—the consideration expressed in the deed being—

"That the first parties are now old and very feeble and require the almost constant attention of someone to look after their wants, and their son W. H. Banister has for a number of years been very kind to them, devoting much of his time and means to their welfare, and agrees and binds himself and family to continue said attention and services to them, providing them with the necessaries of life and furnishing them with fuel, clothes, doctors, and medicines during the remainder of their natural life."

In November, 1908, W. H. Banister and his wife reconveyed this land to F. G. Banister, and on the same day and at the same time F. G. Banister conveyed it to Ruth Banister, the wife of W. H. Banister—the consideration expressed in this deed being that—

"Second party has administered to my comfort in sickness and in health by furnishing me food, medicines and by nursing me in sickness for many years past, and does hereby agree to continue to do so as long as I shall live."

There is some evidence that F. G. Banister was induced to take a conveyance of the land from his son and reconvey it to his son's wife by the fear that if the title was left in W. H. Banister the land might be taken from him in a "night rider" suit that had been brought against him.

As in all cases like this, there is much conflict in the evidence—a number of witnesses testifying that in 1908, as well as in 1906, F. G. Banister had mind and understanding sufficient to make a deed, while others with equal opportunities to know his condition testified that during these years he was weak in body and mind and incapable of entering into a contract. But, we may safely say from the evidence that F. G. Banister, who in 1908 was some eighty-five years old, was quite feeble, had been failing mentally and physically for some years, although not an invalid or unable to go about and attend to the little duties that needed his attention. It is also manifest from the evidence that the appellee W. H. Banister had large influence over his father. This influence commenced in 1895, when he returned to his father's place and continued until his father's death— increasing each year until during the last several years of his father's life he completely dominated and controlled him. Several witnesses testified to statements made by W. H. Banister indicating the influence that he exercised over his father, and it is apparent all through the record that he controlled him as he wished. The old man was very much attached to his daughter Nannie, and her death caused him great distress, and soon thereafter he manifested symptoms of mental trouble that continued until his death. He also had a severe spell of sickness about the time of her death, and this contributed to increase his feebleness and mental trouble; and several witnesses say that after her death he was "never like himself." There is also testimony that W. H. Banister did not treat his sister, the appellant, as a brother should, and his conduct leaves the impression that instead of regretting the estrangement be-

tween the appellant and her father and endeavoring to reconcile them, he in one way and another endeavored to keep them apart. It also appears that although the marriage of appellant displeased her father very much, he always had a fatherly regard for her, and on more than one occasion said that he wanted her to have her share of his estate. There is no direct evidence that the appellee influenced or persuaded F. G. Banister to make the deed disinheriting his daughter, the appellant. And the draughtsmen of the deeds testify that in their judgment he was competent to understand the nature of the transaction and to make the conveyance that he did. But, it is nevertheless true that these conveyances were both unnatural and unreasonable. It is hard to believe that such a man as the witnesses described F. G. Banister to be when he was strong and vigorous should have cut off his poor and widowed daughter, without anything, and have given all of his estate to his son, unless in his feebleness and old age he was over-persuaded and unduly influenced to do it. Occupying the close and confidential relations towards him that the appellees did, and having every opportunity that this relationship afforded to influence him, it should require little direct evidence to induce the chancellor to set aside such a conveyance. It is recited in both the deeds that the conveyances were made in consideration of care and attention and services that the grantees had given to the grantor and would give in the future, but it appears from the evidence that W. H. Banister from the time he moved on the place in 1895 until his father's death, used, controlled and managed it as his own. He says that "we had no written contract—my father told me that he wanted me to take the place, cultivate it, make what we could, and we would have no division of what was made on the place—let each family live on it—his family and mine—that I was not to pay any rent, and all the surplus after both families had gotten a living out of it was to be mine, and that this arrangement continued during the whole period of time." It is also shown that the habits of the old people were simple, and their wants few, and that the rents of the place were worth a good deal more than the care, attention and the services rendered to them. The old folks were seldom sick, and on this account required

little attention; and until a short while before they died, were able to do their own housework, and such little chores about the place as industrious old people are in the habit of doing. In short, we think it plain that the rent of the farm was worth a great deal more than the services, care, attention and support received by the old people out of it.

It also appears that the appellees got all the personal property and household goods that were on the farm when they went there and when F. G. Banister and his wife died. True, this personal property was not shown to be worth much, but whatever it was, they got it all.

We have read with care the entire record, and have reached the conclusion that the deed was not only inequitable and unjust, but its execution was procured by undue influence, and so it should be canceled and held for naught.

It is contended by the appellant that the appellee should be required to account for rent, and for the value of the personal estate that he converted to his own use. But, we are disposed to let the care and attention that he gave to the old people offset the personal property and the rent up to the time of F. G. Banister's death. He must, however, account for one-half of the rent of the place since that time. It also appears that W. H. Banister put some improvements on the place, but he should not be allowed anything on this account; he will get back half the value of these improvements when the land is divided, and the other half may equitably be put in to help offset the income and rents that he received prior to the death of F. G. Banister.

Wherefore the judgment is reversed with directions to set aside the conveyance made in 1908, and for other proceedings in conformity with this opinion.