## McDowell v. Edwards' Administrator.

(Decided December 16, 1913).

### Appeal from Larue Circuit Court.

1. Fraudulent Conveyances.—The law looks with suspicion upon the transfers of property by persons mentally or physically infirm to those having custody of them.

2. Fraudulent Conveyances—Undue Influence.—It is extremely difficult to show by evidence the exercise of fraud or undue influence, and in almost every case where these questions arise they must be established, if at all, by the circumstances.

3. Fraudulent Conveyances—When Conveyance Will Be Set Aside.—Where there exists between two persons the relation of confidence and trust, by which one exercises such an influence over the judgment of the other as to subvert the latter's will and independence, a conveyance by the latter to the former will be set aside as fraudulent upon seasonable complaint; and when such relationship is shown, the burden of proving that in that transaction, the other mind acted freely and of its own volition, is on the person benefited.

4. Mental Capacity — Vendor — Testator.—A vendor must have mental strength and understanding to compete with his business antagonist and to protect his own interest; but a testator has no antagonist to meet, and is not called on to consider whether or not he will be benefited or injured by the act in which he is engaged.

JONES & GRAHAM and WILLIAMS & HANDLEY for appellant.

O. M. MATHER for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is an appeal from a judgment of the Larue Circuit Court, which canceled a contract, dated January 11, 1912, between appellant, James McDowell, and George W. Edwards, eight days before the latter's death.

Edwards was about 70 years of age, and without children. In January, 1911, his wife had obtained a divorce from him. For several years previous to his

death, Edwards had not kept house, but had lived in different places with his relatives. He had lived some three years with his nephew, Jesse Sympson, in Kansas, returning to Kentucky in 1911. In May of that year he went to Illinois, where he remained until November 22, 1911, when he returned to Kentucky and went to the residence of the appellant, McDowell, who was the husband of Edwards' niece. He remained at McDowell's from November 22, to December 20, when he went to the home of Mrs. Maffet, who was also his niece.

The Maffet home was some six or seven miles from the McDowell home. Edwards remained at Mrs. Maffet's until January 1, 1912, when McDowell carried him back to the McDowell home.

On Sunday, January 7, Edwards was stricken with paralysis, which affected the entire left side of his body and face, making it difficult for him to talk. Dr. Jones was called in, and visited him on January 7, 8, 9 and 11, prescribing for him daily. On December 26, 1911, while he was at the home of Mrs. Maffet, Edwards wrote a letter to his nephew, Jesse B. Sympson, and his wife, in Kansas, saying he wanted to go to Kansas and live with them the rest of his days, and that he had better health in Kansas than in any other place. Mrs. Sympson answered promptly, about January 2, giving her uncle a cordial invitation to come and live with them as long as he desired. The letter from Edwards to Sympson is in the record, but Mrs. Sympson's answer has not been produced. It was directed to "G. W. Edwards, in the care of James McDowell, Buffalo, Ky.," and mailed as above stated, about January 2, 1912.

On Thursday morning, January 11, McDowell telephoned to W. M. Graham, an attorney at Hodgenville, to meet him at Buffalo, an intermediate point about six miles from Hodgenville. Graham answered the summons, and met McDowell at Buffalo, where Graham from information given him by McDowell, drew the following contract:

"This contract made and entered into this the 11th day of January, 1912, by and between G. W. Edwards, of Buffalo, Larue County, Ky., party of the first part, and Jas. McDowell, of the same town, county, and State, party of the second part, witnesseth:

"That whereas party of the first part has for sometime lived with second party, and whereas the said sec-

ond party has taken care of first party and has nursed and cared for him during a case of sickness and has always been kind to first party and has been very mindful of his comforts and has furnished board and lodging: Now, for and in consideration of all the above and the further consideration that the said second party will permit first party to live at his home during the remainder of his natural life and will care for him and will take care of him and furnish him board and lodging and clothes, and medicine, and doctors and all necessaries of life and will furnish for the said first party a decent burial, and for the further consideration of one dollar cash in hand paid, the said first party does hereby transfer and assign to second party all of his personal property of every kind and nature and same becomes immediately the property of said second party. Second party hereby acknowledges receipt of the said personal property from the hands of first party. It is understood and agreed by and between the parties hereto and is made a part of this contract that if the first party refuses to reside at the home of the second party then second party is released from obligations under this contract as long as first party resides away from the residence of said second party.

"Given under our hands, this the 11th day of January, 1912.

"G. W. x Edwards.
his
mark

"Jas. McDowell."

"Witness signatures:
"Bruce McDowell,
"E. L. Atherton."

Graham and DcDowell returned to McDowell's residence, where Graham went into Edwards' room and remained there, talking with him, for perhaps an hour. He says he found Edwards rational; and after reading the contract over to him Edwards said it expressed the contract between him and McDowell, and executed it, by making his mark in the presence of witnesses.

Dr. Jones saw Edwards later during that day, and says that while Edwards' temperature had, on former days, gone up as high as to 101 and 102 degrees, it was normal on the afternoon of the 11th, when he visited Edwards for the last time. He was not called to see Ed-

wards after the 11th, but communicated daily, by telephone, with those having him in charge.

On Friday, January 19, Edwards died, and on February 17, 1912, his administrator brought this action against McDowell to cancel the contract between Edwards and McDowell, upon the ground that it had been procured through fraud and undue influence.

Edwards had been an industrious and frugal farmer, and left an estate of about $2,000.00 in cash and notes. The notes had been turned over to McDowell before the agreement had been reduced to writing, but after it had been made.

The chancellor canceled the contract, and from that judgment McDowell appeals.

The testmony as to Edwards' mental condition after January 7th, when he was seized with paralysis, is not very satisfactory. We do not deem it necessary to discuss the evidence in detail. While the opinions of the witnesses are contradictory upon the subject of Edwards' mental capacity to make the contract, there is little difference between them as to Edwards' physical condition from the time he was stricken on January 7th, until his death on the 19th. According to Dr. Jones the paralysis was caused by a flow of blood from a ruptured blood vessel in the brain of Edwards. On several days his temperature rose to between 101 and 102 degrees; and although he was helpless physically, on more than one occasion he called for his clothes, in the night, insisting that he must dress and go out, although he was really unable to rise from his bed, and the weather was severely cold, and the ground covered with a deep snow.

On the night of January 9th, the attendants became alarmed thinking Edwards was dying. It is true that while two witnesses give opinions to the effect that Edwards had sufficient mental capacity to make the contract, and several others relate facts from which it is argued that Edwards was competent, at least one witness is even more positive that he was not competent. And although this witness last referred to—Miss Tabitha McDowell—was impeached, she was fully corroborated by Sutherland upon the important point that Edwards had hallucinations upon the subject of his ability to dress and go out of the house on a severe winter night, above referred to.

The letter to Mrs. Sympson shows that Edwards really desired to go to Kansas for his health; and her generous answer shows that his confidence in her was not misplaced. Mrs. Sympson's letter was mailed about January 2, 1912, and should have reached Edwards before January 11th—the day the contract was made. Its absence is unexplained.

Taking all the evidence together, however, it is impossible to avoid the conclusion that Edwards was in a very serious condition from the time he was stricken on Sunday, January 7th, until his death on January 19th. He was confined to his bed during the whole of that period, suffering from a cerebral hemorrhage, and gradually sinking to his death.

The law looks with suspicion upon the transfers of property by persons mentally or physically infirm to those having custody of them. Even when parties in good health stand in a confidential relation to each other, the burden is upon the stronger character who procures an advantage, to show that a transaction was fair; and relief will be afforded in equity in all such transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed. Allore v. Jewell, 94 U. S., 512. The relief stands upon the general principle applying to all the varieties of relations in which dominion may be exercised by one person over another. Smith v. Kay, 7 H. L. Cas., 750; Tate v. Williamson, L. R., 2 Ch., 61.

In Talbott v. Bedford, 21 Ky. L. R., 897, 53 S. W., 294, a mother, after she became mentally and physically infirm, conveyed to her two sons, who resided with her, and largely attended to her business, her farm on which she resided and the personal property thereon, in consideration of love and affection and that they would support her during her life. The deed disposed of her property in a manner different from her declared intention when her mental and physical condition were better; and about the time the deed was made she expressed a prejudice against her other children with whom she had always theretofore been on good terms. The court canceled the deed, holding that the evidence of the prejudice against her other children was sufficient to authorize the inference that it had been engendered by the other children.

In Koger v. Koger, 29 Ky. L. R., 235, 92 S. W., 961, it was held that the unreasonable and unnatural disposi-

tion of the grantor's estate by a deed, taken in connection with his age, his mental and physical infirmities, left little room for doubt that the grantor would not have made such a disposition of his estate if he had been competent to understand the nature of the transaction, and left to the exercise of his own judgment; and the fact that the grantor had stated to a number of witnesses prior to the making of the deed that he intended to make a different disposition of his property, was cited as evidence of undue influence.

In that case the court said:

"It is extremely difficult to show by evidence the exercise of fraud or undue influence, and in almost every case where these questions arise they must be established, if at all, by the circumstances."

In McElwain v. Russell, 11 Ky. L. R., 649, 12 S. W., 777, a deed made by a paralytic 55 years old, to his physician ten days before the death of the patient, was canceled.

Smith v. Snowden, 96 Ky., 32, was an action to set aside a conveyance by parents, who were 70 years old, and illiterate, to two of their children who lived with them.

The court said:

"In the case under consideration the grantors were old, ignorant, and enfeebled by disease; the grantees were vigorous, aggressive and already in charge of the persons and the property of the grantors. We may say in general that when such a relation exists the person obtaining the benefit must show, by the clearest evidence, that the transaction was freely and voluntarily entered into, and devoid of inequitable incidents."

In Best v. House, 113 S. W., 849, the court emphasized, in the following language, the fact that it requires a greater mental capacity to make a deed than it does to make a will:

"Appellants' counsel concede that he might have had capacity sufficient to make a valid will at the date of the conveyance, but contend that he did not have to make a deed, and cite many cases showing that it requires more mental capacity to make a deed than it does to make a will. The cases in effect hold that a vendor must have mental strength and understanding to compete with his business antagonist and to protect his own interest; but the testator has no antagonist to meet, and is not called

on to consider whether or not he will be benefited or injured by the act in which he is engaged; that the ordinary business affairs of life involve a contest of reason, judgment, experience and the exercise of mental powers not necessary to the testamentary disposition of property. See Bramel v. Bramel, 101 Ky., 75, 39 S. W., 520; American & English Ency. of Law, vol. 28, p. 74, and Ring v. Lawles, 190 Ill., 520, 60 N. E., 881.''

Perhaps one of the best statements of the rule governing such cases is to be found in the late case of Hoeb v. Maschinot, 140 Ky., 330, where this court said:

''Where there exists between two persons a relation of confidence and trust, by which one exerts such an influence over the judgment of the other as to subvert the latter's will and independence, a conveyance of the latter to the former will be set aside as fraudulent upon seasonable complaint. Whether such influence was exerted is a question of fact to be determined from the circumstances. Evidence of the fact may consist of such relationship of blood, or consanguinity, or as attorney and client, guardian and ward, physician and patient, and the like, and when such relationship is shown, and a voluntary conveyance beneficial to the grantee, the burden of proving that in that transaction the other mind acted freely, of its own volition, is on the person benefited, or the conveyance will be set aside. (Smith v. Snowden, 96 Ky., 32; Maze's Exor. v. Maze, 30 Ky. L. R., 679.) The reason of the rule is, it is not customary for people to give away their property, particularly to strangers in blood. It is also known that one who has the entire confidence of another can induce the latter to do with his property that which a stranger could not. Every day observation is full of incidents of over-reaching of that character. Such abuse of confidence is in law a fraud.''

In Johnson v. Stonestreet, 23 Ky. L. R., 2102, 66 S. W., 621, a deed made by a man 80 years of age to a person with whom he lived, conveying real estate worth from $2,500 to $3,000, in consideration of the grantee's undertaking that he would support the grantor for the remainder of his life, was canceled, although the grantor was not shown to have been of unsound mind. In that case the court said:

''Under all the facts and circumstances we conclude that the contract was an unconscionable bargain obtained

by appellant; as no ties of blood or even long friendship are shown to have existed, the chancellor, looking at all the facts and surroundings, was authorized to reach the conclusion that the contract and deed were obtained by undue influence. Proof of such facts is shown circumstantially, from the very nature of the case, and we are of the opinion that the facts and the circumstances shown in the proof here are sufficient to sustain the judgment and decree of annulment and cancellation of the deed.''

In Bazarth v. Banister, 143 Ky., 476, it was held that where the grantee is the son of the grantor, who is enfeebled with age and lives with him, and has his confidence, only slight evidence of undue influence is necessary to authorize the setting aside of the deed on that ground.

See, also, Hall v. Orme, 146 Ky., 467.

Ordinarily, the burden of proving actual fraud is on the party alleging it; but where fraud, implied from the fiduciary or confidential relation of the parties, is charged, the burden is on the person against whom the complaint is made, to show the fairness of the transaction. Shacklette v. Goodall, 151 Ky., 20.

Furthermore, it will be observed in this case that the consideration for the deed to appellant was practically nothing, in view of the clearly apparent fact that Edwards was upon his death bed at the time the contract was made, and could not possibly live longer than a few days or weeks, at most. This fact, taken in connection with the other circumstances attending the transaction, fully justified the chancellor in canceling the contract.

It is contended by appellant that the weight of the testimony is with him, and that it has not been shown that Edwards was incapable of making the contract, or that undue influence had been exercised in its procurement. But in cases of this character the burden is upon the party who has obtained the advantage, and the verbal testimony of witnesses must be considered in connection with the facts and attending circumstances which surround the transaction; and, when the facts of this case are considered, there is no escape from the conclusion that Edwards was in no condition to transact business, much less to make a contract disposing of his entire estate. It was only four days after he had been stricken with paralysis, and less than two weeks before his death.

If, however, we should be in doubt as to this conclusion, we would, nevertheless, be slow in setting aside the judgment of the chancellor upon a question of fact.    The rule is, that where the evidence is conflicting, and the court is not convinced that the chancellor has erred to the prejudice of the substantial rights of the appellant, or has merely a doubt as to the correctness of the judgment, it will not be disturbed.    Byassee v. Evans, 143 Ky., 415; Kirkpatrick's Exor. v. Rehkopf, 144 Ky., 134; Wathen v. Wathen, 149 Ky., 505; Norris v. Isaacs, 149 Ky., 709; Bond v. Bond, 150 Ky., 392; Salmon v. Martin, 156 Ky., 309.

Judgment affirmed.