## Wiley v. Wiley, By her next friend.

(Decided December 21, 1917).

### Appeal from Graves Circuit Court.

1. **Fraud—Undue Influence—Burden of Proof.**—The law looks with suspicion upon the transfer of property from persons mentally or physically infirm to those having custody of them. In such cases the burden is upon the person who procured the advantage to show that the transaction was fair; and relief will be afforded in equity against all such transactions in which influence has been acquired and abused, or in which confidence has been reposed and betrayed.

2. **Husband and Wife—Communications Before Marriage.**—Section 606 of the Civil Code of Practice providing that neither the husband nor his wife shall testify while they are married, or afterwards, concerning any communication between them during marriage, and that neither of them shall testify against the other, does not prohibit a widow from testifying against a third person concerning a communication between the widow and her husband before they were married.

3. **Dower—Assignment at Common Law—Statute.**—At common law the widow was entitled, at her election, to have dower assigned her in each separate tract of land owned by the husband during coverture; but under section 2141 of the Kentucky Statutes, if the lands are not severally held by different devisees or purchasers, it is not necessary to assign dower out of each separate portion, but an equitable allotment may be made in one or more parcels in lieu of the whole.

ROBBINS & ROBBINS and B. C. SEAY for appellant.

HESTER & HESTER for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

When Allen Wiley died many years ago he left a widow, Susan Barber Wiley, and several children, in-

cluding the appellant, A. H. Wiley, called Wile Wiley in this record, surviving him. At the time of his death. Allen Wiley owned a tract of land containing 103 acres. The appellant, Wile Wiley, is the father of Birk Wiley, who was the husband of the appellee, Irene Wiley. Wile Wiley and his wife separated many years ago and divided his landed estate between them, he taking a tract of about 100 acres.

Birk Wiley had been raised principally by his grandparents; but when his father and mother separated, Birk, who was then unmarried and about twenty-three years of age, went to live with his father upon the 100-acre tract, Birk doing practically all the work and caring for his father. For about five years they kept "bachelor's hall"; but thereafter they boarded with Etna Wiley for about four years until Birk Wiley married Irene Bunton in March, 1915.

In the meantime, while Birk was living with his father he had worked hard and saved his money, which he used in buying small tracts of land in the neighborhood. On September 4, 1905, he bought a poor tract of eighty acres for which he paid $80.00. Two years later, on October 15, 1907, he bought the interest of the other heirs in the 103 acres which had belonged to his grandfather, Allen Barber, for which he paid $175.00; and he rented the life interest of his grandmother Susan in the above tract for $30.00 a year. This arrangement gave him the control of the 103 acres for farming purposes. Finally, on June 21, 1910, Birk bought the Simpson farm of 68 acres for $1,400.00. One-half of this purchase price he paid in cash and the other half he borrowed from his uncle, W. E. Olive.

After Birk had bought his land as above stated he spent most of his time in cultivating it; and his father rented his 100 acres to other persons and lived on the rent derived therefrom. Wile Wiley was a thriftless, drinking, garrulous man, and repeatedly told his neighbors that the rent from his 100 acres and two old mules that he owned constituted his entire estate.

In November, 1914, Birk became engaged to Irene Bunton and informed his father that he expected to begin housekeeping for himself, and would let his father keep house for himself. To this proposition Wile Wiley objected strongly; he not only objected to his son marrying Irene Bunton, but he objected to his marrying any one. Wile Wiley told his brother-in-law, W. E. Olive,

that Birk was going to marry Irene Bunton; that he was opposed to it and wanted to get a ten-year lease on Birk's land; that Birk and Irene would not live together six months, and Wile Wiley could not afford for a d—d Bunton to live on it.

Wile Wiley succeeded in this purpose by obtaining a contract of lease from Birk Wiley on January 8, 1915, which recited that Wile Wiley and Birk Wiley had been partners in farming, buying, and general trading for the past ten years; that during said partnership the land occupied by them belonged wholly to Wile Wiley; that one-half of all that was produced also belonged to Wile Wiley, less what was a reasonable amount for his support during the ten years; and that in consideration of these things, Birk Wiley leased the Simpson farm to his father for a term of ten years, beginning January 1, 1915. The lease further provided that Wile Wiley was to pay nothing more for the use of this land than he had theretofore paid, it being inserted in the lease that the partnership set forth had paid the rental for the term of ten years.

The Simpson farm was the most valuable tract then owned by Birk Wiley and constituted his principal estate. The contract was given to W. E. Olive to hold; it was not then acknowledged and was not recorded until after Birk's death. In March, 1915, Birk and Irene Bunton were married. Early in February, 1916, Birk Wiley was stricken with appendicitis and submitted to a surgical operation. He was confined to his bed for about three weeks, and died on Tuesday, Feb. 29, 1916.

However, on Feb. 26, 1916, three days before Birk's death, his father, Wile Wiley, caused a paper to be drawn which he had Birk sign and acknowledge, stating that all the personal property and land standing in Birk's name was their joint property, except two young mules which Birk had bought from Holmes and McBee. Wile Wiley had the attending physician make a certificate that Birk was then in his right mind. Again, two days later, on Feb. 28th, which was Monday, and the day before Birk's death, Wile Wiley had Birk sign another paper declaring that all the cattle in Birk's possession belonged jointly to Birk and his father, and selling them to McLain & Son. Wile Wiley again procured a written certificate from the attending physician stating that Birk was still in his right mind. This occurred late on Monday evening, and Birk died on Tuesday morning.

Wile Wiley evidently thought the certificates of Birk's mental condition constituted a sufficient armament to protect the papers thus obtained from an apprehended attack.

Furthermore, on the Sunday before Birk's death, Wile Wiley sent his son, Etna Wiley, to Mr. Olive and procured the lease of Jan. 18, 1915, and had Birk acknowledge it before a notary. The notary wrote the certificate on the back of the lease, and instead of giving it the true date, the certificate was dated February 26th, which was Saturday, and the day before the lease had been procured from Mr. Olive. It is thus made to appear that the lease was acknowledged on February 26th, which was three days before his death, although it was not procured from Mr. Olive until after that date.

After Birk's death, his father took charge of everything and practically drove his daughter-in-law Irene from the premises, without even a change of clothing. She was then not quite eighteen years old. Joe Laird qualified as administrator of Birk Wiley's estate; and, while he was conducting a sale of the deceased's property Etna Wiley slipped up behind him and knocked him down.

Subsequently, the administrator filed two actions against Wile Wiley; the first for the two young mules which Birk had bought from Holmes and McBee; and a second to recover the money for which the cattle had been sold to McClain before Birk died. At the same time Irene Wiley, by her next friend, filed a third action against Wile Wiley seeking to have the ten-year lease cancelled upon the ground that it was fraudulently made to deprive her of her marital rights, and also asking that dower be assigned to her. The three actions were consolidated and upon a trial the chancellor entered a comprehensive judgment disposing of all the issue raised by the pleadings.

The judgment disposed of the case as follows: (1) It gave Susan Barber Wiley, the surviving widow of Allen Wiley, a dower and life interest in one-third of the 103-acre tract hereintofore referred to, and gave Irene a dower and life interest in the remaining two-thirds of said tract; (2) it declared that there was never any partnership existing between Birk Wiley and his father except as to a small saw mill which has been accounted for; (3) that the ten year lease of Jan. 18, 1915, for the Simpson farm was executed after Irene and Birk had contracted to marry each other and for the fraudulent

purpose of defeating Irene's marital rights therein, and was, for that reason, void as to her; (4) that the writing dated February 26, 1916, and executed by Wile Wiley and Birk Wiley declaring that the personal property in Birk's possession was the joint property of both of them except the two mules above referred to, was executed by Birk on the eve of his death; that the recitals were untrue; that the paper was executed while Birk was laboring under the influence and domination of his father, and was fraudulent and void as to Irene Wiley; (5) that the cattle sold to McClain was the property of Birk Wiley, and that his father had no interest therein; (6) that Irene was entitled to dower in the three tracts of land which Birk had bought in 1905, 1907 and 1910, as hereinbefore stated; and (7) it appointed commissioners to lay off dower to the widows, Susan Barber Wiley and Irene Wiley.

In allotting dower the commissioners laid off to Irene 26½ acres out of the Simpson Farm, which was the subject of the ten-year lease. Wile Wiley filed exceptions to the report contending that Irene's dower should have been allotted entirely out of the other two tracts, so as not to interfere with his lease which was valid except in so far as it interfered with the dower right of Irene.

The court overruled the exceptions to the commissioners' report and confirmed it as made. Wile Wiley appeals.

1. The question of fact presented upon this appeal needs little discussion. It would perhaps be presuming upon the intelligence of the court to seriously argue that any of the transactions between Birk Wiley and his father during the Saturday, Sunday and Monday previous to Birk's death should be seriously treated as having any validity. The mere statement of those facts as heretofore narrated is a sufficient condemnation. The elements of fraud, duress, and undue influence all entered into those transactions. No rule is better settled than that the law looks with suspicion upon all transactions between father and son, especially when the son is in a dying condition. This case in its deathbed features is quite like McDowell v. Edward's Admr., 156 Ky. 475, where the court, in setting aside a deathbed transaction, said:

"The law looks with suspicion upon the transfers of property by persons mentally or physically infirm to those having custody of them. Even when parties in good health stand in a confidential relation to each other, the

burden is upon the stronger character who procures an advantage, to show that a transaction was fair; and relief will be afforded in equity in all such transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed. Allore v. Jewell, 94 U. S., 512. The relief stands upon the general principle applying to all the varieties of relations in which dominion may be exercised by one person over another. Smith v. Kay, 7 H. L. Cas., 750; Tate v. Williamson, L. R. 2 Ch., 61.''

This rule has been so often approved and applied by this court as to become firmly fixed in our jurisprudence, and needs no application. See Bozarth v. Bannister, 143 Ky. 476; Shacklette v. Goodall, 151 Ky. 20; Miller v. Taylor, 165 Ky. 467; Williamson v. Lowe, 172 Ky. 87; Brown v. Staton, 172 Ky. 793; Kimmel v. Berresheim, 173 Ky. 734. This conclusion is strongly re-enforced by that portion of the proof which shows that Wile Wiley, although he claims he owned one-half of the land and personal property in contest, at no time claimed to have contributed or paid any part of the purchase money therefor. On the contrary he had no business; did no work that any one knew of; and had no money except the rent from his hundred acre tract which was barely sufficient to support him.

With respect to the lease of the Simpson farm, it is clear that the purpose of Wile Wiley in obtaining that paper was to exclude his daughter-in-law Irene and her family from participating in the ownership of the Simpson farm or from occupying it for at least ten years. He so stated to his brother-in-law Olive; and that it was procured by duress and undue influence there can be no doubt. Wile Wiley never took possession of the land, and held the lease secretly from Irene, who did not discover its existence until after her husband's death. Furthermore, Birk never surrendered possession of the farm, and, at the time of his death, he was actually preparing to build a residence upon the land, for himself and his wife. In holding that the transaction was a fraud in so far as it interfered with Irene's marital rights the court was clearly justified under the proof.

2. It is insisted by the appellant that the court erred in permitting Irene to testify as to the date of her engagement to marry Birk Wiley. It was the purpose of this testimony to show that Wile Wiley knew of Birk's engagement to marry Irene at the time he took

the lease for the Simpson farm, and that he had a fraudulent purpose in procuring it. It is contended that this evidence was incompetent under section 606, subsection 1, of the Civil Code, which provides that neither the husband nor his wife shall testify while the marriage exists or afterwards concerning any communication between them during marriage, and that neither of them shall testify against the other. In answer to this argument appellee contends that the case is not within the terms of the statute because Irene's testimony did not refer to any communication between her and her husband during their marriage, nor did she attempt to testify while the marriage existed, nor against him.

As the communication was made before the marriage and Irene was testifying after her husband's death and against Wile Wiley only, it is apparent the case does not come within the inhibition of the statute.

Furthermore, Mrs. Jennie Laird, a niece of Wile Wiley, testified at length upon this subject, saying that he told her, about a month before the marriage, that Birk and Irene were to marry. And, the testimony of Olive is to the same effect.

3. Finally, it is insisted that the dower of the widow, Irene, should not have been allotted out of the Simpson farm covered by the lease, there being sufficient ground in the other tracts to endow the widow. In support of this contention counsel for the appellant cites section 2141 of the Kentucky Statutes, which provides as follows:

"Where the lands are not severally held by different devisees or purchasers, it shall not be necessary to assign dower out of each separate portion, but an equitable allotment may be made in one or more parcels in lieu of the whole.'

The history and interpretation of this statute may be read in Smith v. American Tobacco Co., 149 Ky. 592.

At common law the widow was entitled, at her election, to have dower assigned her in each separate tract of land owned by the husband during coverture. Richmond v. Harris, 102 Ky. 389. But the courts of equity departed from this strict rule in cases where land had been conveyed with a warranty by requiring the widow to take her dower wholly out of unsold tracts whenever it was necessary to prevent circuity of actions, and it could be done without injustice to her. This equitable principle

was adopted by our statute of 1835, which further provided, however, "that when dower is claimed in lands aliened or devised to different persons, dower shall be assigned, as heretofore, out of each separate tract." Loughborough's Stat. Laws, p. 214.

Section 2141 of the Kentucky Statutes is merely a short restatement of the act of 1835 in negative terms and provides that the equitable rule above referred to may be followed when the lands are not held by different devisees or purchasers. It follows, therefore, that if the lands are held by different purchasers or devisees, the statute does not apply, and the widow takes her dower out of each tract, under the common law.

But the preparation of this case does not bring it within the lines of the statute, since it is not made to appear that the lands are held by the same devisees or purchasers; and, that fact must appear before the statute can be invoked. Otherwise, the common law rule governs.

Furthermore, the statute is permissive, not mandatory, in its terms. And, it is one of the elements of the rule that it will not be applied if it would work an injustice to the widow. Richard v. Harris, *supra.*

One-third of the 103-acre tract was allotted to Mrs. Susan Barber Wiley as her dower, leaving only two thirds of that tract available for allotting dower to Irene; and it is not shown that her entire dower could have been allotted out of this remaining two-thirds and the comparatively worthless 80-acre tract, as appellant insists should have been done. There is no proof upon either of these subjects; the appellant merely claims the right to apply the statute in the allotment of appellee's dower without showing the facts that are necessary to put the statute in operation. In the absence of proof showing that the lands were held by the same devisees or purchasers, and that dower could have been assigned wholly out of the other two tracts without injustice to the widow, the chancellor properly applied the common law rule.

Judgment affirmed.