## England, et al. v. Crawford, et al.

(Decided December 1, 1922.)

### Appeal from Monroe Circuit Court.

1. Deeds—Setting Aside—Burden of Proof.—The burden is upon the transferee or grantee in a suit to set aside the transfer of or a deed to property to show that the transaction was freely and voluntarily entered into and devoid of inequitable incidents when a confidential relation exists between the parties, and such confidential relation does exist where the beneficiary under the transfer or deed sustains the relation of nurse and custodian to the transferor or grantor.

2. Deeds—Undue Influence.—The law looks with suspicion upon the transfers of property by persons either mentally or physically infirm to those having custody of them, and also views with suspicion death bed transfers between parties sustaining such a relationship, and will in such cases infer undue influence from slightest circumstances.

3. Cancellation of Instruments—Inadequate Consideration.—In this case a farm worth between six and seven thousand dollars was deeded to one who had custody of the grantor and who was employed to nurse and look after him in his then afflictions two months before the grantor had executed a will disposing of all his property, but after the grantee in the deed assumed custody of him he became dissatisfied with the will and first proposed to deed to the grantee only a portion of the farm, but one week thereafter executed a deed conveying all of it in consideration of the grantee looking after and taking care of his wife after the grantor's death, although he had provided for her support out of his personal property by his will and which the deed did not alter.

The wife was in poor health and in the natural course of events could not be expected to live a long while: Held that, under the narrated circumstances, plus other facts appearing in the opinion, and in view of the grossly inadequate consideration, the chancellor properly cancelled the deed and also another contract of the same date executed by the grantee.

C. C. CRABTREE, JACKSON & DENHAM and OLIVER & DIXON for appellants.

HEBRON LAWRENCE and BASIL RICHARDSON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

I. A. Jenkins died testate and a resident of Monroe county on December 15, 1919. He was 58 or 59 years of age at the time and his wife, Sarah J. Jenkins, whom he left surviving him, was about twelve or thirteen years older. They had been married for quite a while, but had no children, and the decedent owned a farm in that county containing between 130 and 140 acres, with stock and tools to operate it, and $1,500.00 in United States Liberty Bonds, and about $2,400.00 cash in bank. His will, which was executed on October 15, 1919, just two months before his death, gave to named trustees all of his property, except one Liberty Bond of $500.00, with directions that they use the personal property for the support, maintenance and comfort of his wife during her life and to augment it if insufficient for that purpose by the income from the real estate during her life, and directed his trustees to "hold and dispose of same to the best of their judgment for the benefit of my wife, Sarah Jane Jenkins, during her life." He also expressed a desire that his trustees employ some one not related to him to take personal care of his wife and that such person be remunerated for his services. After the death of his wife he directed that the remainder of his property be equally divided between his brothers and sisters or the heirs of any who might be dead.

Some time before the execution of the will, appellant and defendant below, John C. England, who was 37 years of age and married, entered into some kind of arrangement with the decedent by which he was to cultivate some portion of the farm and to nurse, look after and take care of the decedent and his wife, the latter of whom was very deaf and feeble, both mentally and physically. The decedent himself had been afflicted with throat and lung trouble since the spring of 1919, as a

result of an attack of influenza and had gradually declined in health until he was quite feeble when the will was executed and grew more so until his death. About the time of the execution of the will defendant and his wife moved into the house of Jenkins and continued to live there until the death of the latter.

On December 12, 1919, the decedent and his wife executed a deed to the defendant, England, conveying to him the farm in consideration, as stated in the deed, "of contract made by the said parties of the first and second part separate and apart from this deed." The contract referred to in the deed was executed on the same day by England alone and in its entirety reads:

"Articles of agreement and contract made and entered into this Dec. 12, 1919, by and between Johnnie C. England, of Gamaliel, Monroe Co., Ky., of the first part; and Isaac A. Jenkins and wife, Sarah J. Jenkins, of Gamaliel, Monroe Co., Ky., the second part. Witnesseth. That the said party of the first part doth hereby covenant and agree to take care of the said Isaac A. Jenkins and his wife, Sarah J. Jenkins, until their death. It is further agreed that the said Johnnie C. England is to see that Isaac A. Jenkins' brother, Bill Jenkins, and sister, Mollie England, gets $500.00 each if living, if dead to their heirs; this $500.00 each is to be paid out of Isaac A. Jenkins' and wife Sarah A. Jenkins' money and property if above more than it takes to take care of them, if not, it is to be paid out of the said land."

This action was filed by the heirs at law of the decedent, who were the legatees and devisees in remainder of his property, and the administrator and trustee with the will annexed (those named in the will declining to qualify) against England and his wife and decedent's widow, who declined to join as plaintiff, seeking to set aside, cancel and annul the deed and the contract of the same date upon the ground that both decedent and his wife were mentally incapacitated to execute them; that they were unduly influenced to do so, and that their execution was procured by fraud. Appropriate pleadings made the issues and upon final submission after proof taken the court sustained the prayer of the petition and cancelled both of the writings and this appeal by defendants questions the correctness of that judgment.

It will thus be seen that the only question for determination is one of fact, *i. e.,* whether the decedent at the time he executed the deed and the separate writing of the same date, was mentally incapacitated to do so, or whether he was unduly influenced to do so, and in determining those questions we will not undertake a literal recitation of the evidence, but will content ourselves with a general statement of what it tended to prove and the circumstances preceding and following the transactions.

Neither England nor his wife were related to decedent or his wife. Defendant and his wife were in the home of decedent at the time the will was executed, but whether they had moved their household goods at that time does not appear, but if not they did so within a short time thereafter. Defendant knew of the contents of the will and he had called a banker and another friend of the decedent for the purpose of writing it. According to the defendant, whose testimony was taken as if on cross-examination, decedent within a few days after the execution of the will expressed dissatisfaction at its contents and a desire to change it, though what produced such early dissatisfaction does not appear. Defendant is corroborated by his mother, brother-in-law and other close relatives and they all say that shortly thereafter decedent expressed a desire to convey part of his farm to defendant in consideration of the latter taking care of his wife after his death; and about a week before the execution of the deed defendant procured a Mr. Hays to come to the home of decedent for the purpose of preparing it. The latter appeared at the Jenkins home as requested but he did not prepare the deed, nor was one then executed, since decedent had not established any line between the portion of land he expected to convey to defendant and the portion he expected to retain. A few days later defendant procured a Mr. Turner, who was a notary public and who was a schoolmate and long standing friend of his, to come to the home of the decedent and prepare the deed and at the same time requested Dr. Smith to be present on the day agreed upon in order to be a witness to the condition of decedent's mind, which matter according to defendant was discussed between him and decedent beforehand. The deed was prepared by Dr. Smith in the presence of Turner, but the former knew nothing about the separate contract which was executed after he left

and was retained by England until after the death of Jenkins. On that day Dr. Smith was convinced that Jenkins could live but a short while and so informed defendant. He was very weak and executed the deed while in bed and, as we have seen, died three days thereafter. Defendant, his mother and others of his relatives, with Dr. Smith and perhaps one or two other witnesses, testified that in their opinion decedent possessed sufficient mind to transact business on the day the writings in contest were executed, but they admitted that he was feeble physically and that at times his mind was flighty, which some of the witnesses described as "franzy," but they claimed that in the main such conditions were due to medicines administered to relieve pain. A number of witnesses who were introduced by plaintiffs, besides themselves, testified that the mind of both decedent and his wife was weak for some time before the execution of those writings and which continued till his death and that according to their opinion he was not mentally capable of disposing of his property by deed. Two witnesses testified to the same condition of his mind on the day the writings were executed. Defendant and his near relatives testified that the dissatisfaction of decedent over his will, followed by his determination to deed·a part of his property to defendant, was caused by his relatives not visiting him after the will was executed, although, as we have seen, there was a very short time between the latter date and the date of the dissatisfaction, and it is in proof that his relatives visited him about as frequently after that date as they did before. Two of his sisters were disabled from visiting him because of accidents sustained by them, and one of them had a daughter who was afflicted and confined in bed, while others lived at some distance from him. It is admitted by defendant that he, his wife, and perhaps others of his relatives discussed the matter with decedent in the presence of his wife, but none of them notified the relatives of the decedent's expressed sorrow and grief over their non-attendance upon him.

Besides the direct testimony on the issue of the mental condition of decedent, we can not fail to be impressed with the undisputed circumstances, that the decedent became suddenly dissatisfied with his will after defendant moved into the house; that a different person was called by defendant to write the deed from the ones who had written the will; that the first effort was to deed

defendant only part of the land and within a week thereafter the whole of it was deeded and a different person was present and prepared the deed; that Dr. Smith was admittedly sent for and his presence requested in order that he might be a witness to scented litigation; that the same Dr. Smith attended decedent and displaced his long standing family physician, Dr. Crabtree, for the first time after defendant assumed his relations with the decedent; that defendant executed the separate contract after Dr. Smith left and retained it in *his* possession; that defendant knew at the time the deed was executed that the grantor therein had but a few days to live and that his wife, on account of her physical condition, would, in all probability, soon follow him to the grave, and that the expenses of taking care of her were to be paid out of the personal property which the separate contract executed on the same date of the deed did not alter. He was, therefore, procuring a farm worth from six to seven thousand dollars, according to the proof, for no other consideration than becoming custodian of the person of the widow for the short time while she had to live with at least her necessary individual expenses paid out of the personal property of his grantor by the trustees under the former's will.

We, therefore, have not only the direct testimony of the witnesses as to decedent's mental condition, but there appears abundant opportunity for the exercise of undue influence, with some testimony showing that the opportunity was improved, and we further have the usual suspicious circumstances attending transactions of this nature, plus a grossly inadequate consideration. There existed a confidential relation between defendant and the decedent at the time the attacked writings were executed. He and his wife sustained the relation of custodians of and *quasi* nurses to decedent and his wife, and observation and experience teach that, in some instances at least, the nurse acquires great influence over his patient, especially if the treatment accorded the patient is kind and attentive. In such cases the burden is on the one seeking to uphold the transaction to prove "by the clearest evidence that its execution was freely and voluntarily entered into and was devoid of equitable incidents." Sword v. Fields, 192 Ky. 629, and numerous other case cited therein. Decedent's widow was very deaf and the overwhelming weight of the evidence shows that her mind was weak either from partial-

ity of nature in withholding her share of ordinary intelligence or from age augmented by affliction. The testimony shows that her husband recognized that fact and so stated at the time his will was written and, indeed, it is conceded in one of the briefs filed for appellants.

In McDowell v. Edwards, 156 Ky. 475, the manner in which the law views transactions of this kind is thus stated: "The law looks with suspicion upon the transactions of property by persons mentally *or* physically infirm to those having custody of them," and it is further stated therein that where a confidential relation exists the burden is still upon the claimant to show the complete fairness of the transaction although the maker of the instrument was in good health. In the case of Miller v. Taylor, 165 Ky. 463, it is said: "The proof of undue influence in this case is slight (more so even than in the instant case) but, under the law which looks with suspicion upon death bed transfers, it is sufficient to support the finding of the chancellor."

In addition to the foregoing we have the finding of facts by the chancellor and under the prevailing rule of practice in equity cases we are not authorized to reverse his judgment, unless it is against the preponderating weight of the testimony, although there might exist a doubt in our mind as to its correctness. We entertain no such doubt, nor do we think his finding was against the preponderance of the evidence, and the judgment is, therefore, affirmed.