## Fuson et al. v. Fuson.

(Decided Feb. 10, 1933.)

E. B. WILSON for appellants.

E. N. INGRAM for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellee and plaintiff below, Millard B. Fuson, owned a farm in Bell county, Ky., located about seven miles from Pineville, and containing as much as or more than 200 acres. On November 18, 1930, he conveyed it by deed to his two sons, the appellants and defendants below, Boyd and W. L. Fuson; the expressed consideration stated in the deed being "One dollar cash, and natural love and affection * * * and other good valuable and sufficient considerations." A reservation therein says: "There is reserved to first party a life estate in the following described boundary of land, it being understood that first parties wife is now deceased and second parties will permit the use of any and all of said property by first parties he may desire during his natural life time so long as the fee shall pass to second parties upon the termination of first parties life estate."

On October 10, 1931 this action was filed in the Bell circuit court by plaintiff against defendants to cancel the deed he had executed to them, upon the ground that in his then mental and physical condition they had fraudulently induced him to execute it, and by their undue influence they had overreached him and caused him to enter into such an unconscionable bargain. He also averred in his petition, that it was agreed, though not appearing in the deed, that defendants were to pay him a monetary consideration, which he said was $6,000, and which was omitted from the deed by fraud or mistake, and he alternatively prayed that, if the court should not cancel the deed, it should be reformed so as to express the true consideration, and that a judgment be given him for the amount of it with a lien upon the land. The court sustained defendants' motion to require plaintiff to elect whether he would proceed for cancellation or reformation, and which we think was error, but, since appellee has prosecuted no cross-appeal and is not otherwise making complaint of that ruling, we are without authority to review or correct it. The demurrer filed to the petition was also over-

ruled, and which undoubtedly was proper. The joint answer of defendants was a complete traverse of all material facts averred in the petition, and upon final submission, after proof taken, the court canceled the deed, and from that judgment defendants prosecute this appeal.

Before taking up the merits of the case, we wish to call attention to the fact that in appellee's brief the positive statements are made, that the court made no ruling on the demurrer of defendants filed to the petition, nor on their motion to elect, nor on exceptions filed by them to certain questions and answers contained in depositions taken by plaintiff, when the record expressly shows that on January 11, 1932, the day upon which the judgment was rendered, the court expressly overruled the demurrer filed to the petition, sustained the motion to elect, and sustained in part and overruled in part every exception filed to the testimony. We refer to this because such erroneous statements in briefs are very misleading to this court. Statements of counsel in their briefs filed in this and all other courts should be accurate, since they are officers of the court with the imposed duty upon them to honestly and fairly aid and assist it in the proper determination of the cause, and which duty especially enjoins upon them to never intentionally or carelessly misrepresent any fact. We will now proceed to the determination of the case on its merits.

The law in a case like this is, that, in the absence of some qualifying fact, testimony to overthrow a solemnly executed writing should be clear and convincing. But where the parties involved occupy a confidential relationship toward each other and the consideration is not fixed in amount but is wholly indeterminate, dependent upon future events rendering its adequacy problematical, then the burden is cast upon the beneficiaries of the contract (grantees in a deed) to show by clear and convincing proof that the transaction was fair and free from the taint of any undue influence, overreaching, or fraud. A long list of domestic cases could be appended in substantiation of what we have said, but we will refer to only, Smith v. Snowden, 96 Ky. 32, 27 S. W. 855; Bozarth v. Banister, 143 Ky. 476, 136 S. W. 902; McDowell v. Edwards' Adm'r, 156 Ky. 475, 161 S. W. 534; Miller v. Taylor, 165 Ky. 463, 177 S. W.

247; Kelly v. Fields, 167 Ky. 796, 181 S. W. 657; Watson v. Watson, 190 Ky. 270, 227 S. W. 270; Sword v. Fields, 192 Ky. 629, 234 S. W. 202; Oliver v. Noe, 232 Ky. 809, 24 S. W. (2d) 592; and Stege v. Stege's Trustee, 237 Ky. 197, 25 S. W. (2d) 324.

Such being the law, it becomes necessary to briefly examine the testimony heard upon the trial in order to ascertain whether or not the judgment was correct. Plaintiff had been married twice, the last time in 1893, and the wife of that marriage died a little more than one year before the deed was executed. From that time until a month or more before the deed was made, another son, who was a barber by profession, moved into plaintiff's house with his wife and children, and they lived together as one family until that son secured a position in his avocation in the city of Indianapolis, Ind. One of the defendants, W. L. Fuson, lived in a tenant house on the farm and, when the barber went away, plaintiff took up his abode with that son in the tenant house. But some days before the deed was executed plaintiff became dissatisfied with living in the tenant house and wanted to move to his old residence, which resulted in W. L. Fuson changing his residence from the tenant house to the old and long established Fuson residence. Plaintiff was 72 years old, almost completely deaf, and with impaired vision. He had successfully passed through an attack of flu, followed by protracted fever. He was also much depressed over the death of his last wife, who was the mother of a number of his large family of children; the mother of some of them being his first wife. One of the girls was married and lived in Harlan, Ky., as was also true of defendant Boyd Fuson.

At the time the deed was executed, some of the younger girls were in school, while one was teaching school, but they visited their father on all convenient ocasions. What little there is in the testimony upon the subject shows that plaintiff was very much attached to his children, and at no time exhibited any preference of one over another. He frequently stated, both before and after the execution of the deed, that he wanted his children to share equally in his property, and he testified that as an inducement and as a consideration for his making the deed was the promise of the defendants that they would pay, as they could, a mon-

etary consiaeration for the farm so that it might be divided between plaintiff's other children, either before or after his death, as he saw proper. He also testified that he never understood the deed (as he afterwards discovered it was written), and there is no testimony to the contrary, except the conclusion statements of the two defendants; the draftsman of it not appearing as a witness. As illustrative of the manner in which the subject arose and how the deed came to be executed, we insert a part of the testimony of the defendant W. F. Fuson, and which is:

"Who first mentioned the making of this deed? A. My daddy.

"Q. What did he say? A. He said he wanted us to have the place.

"Q. Who do you mean by 'us'? A. Boyd and myself, he said he didn't want the place torn up. That is about all he said.

"Q. Was there anything else said as you recall by him in that conversation? A. *I don't remember.*

"Q. Was there anything said about what you were to do in case he conveyed the land to you? A. Yes, sir, he said he wanted some place to stay and wanted to be took care of.

"Q. Did you or your brother Boyd, at that time and place make any reply to him in that connection? A. Well, we asked him what terms he wanted to convey the land to us.

"Q. What did he say to that if anything? A. Well, he said that Mr. Brock had offered him four thousand dollars for the place, but us boys could have it for one thousand less.

"Q. What did you say then, if anything? A. He said he didn't want any money and we could *give the other heirs something* if we wanted to, some deserves it and some don't.

"Q. Was there anything further said between you about conveying the land. A. *I don't remeber.*

"Q. In that same conversation there, did he say to you all that he expected of you that you and Boyd keep him up his lifetime? A. *No sir.*

"Q. When was the next time and where was this subject brought up? A. I believe it was after we moved over at the old home place we had the next talk about it, Boyd, he come up and told us he was ready to make those papers the day before he made the deed.

"Q. What did he say then? A. He said all right.

"Q. Did he say anything else? A. I don't *believe* he did." (Our emphasis.)

The testimony of the defendant Boyd Fuson concerning the same matter is, if anything, less definite and more inexplicit than that given by his brother. His testimony was:

"Q. Tell what he said. A. He asked if we could get the folks (another brother's family) out of the house (the old home place) that he would like to live over there and would make us a deed to the place.

"Q. Who was living there at the time? A. Sil.

"Q. What else did he say? A. He talked about moving over at the old home place. Said he would be better satisfied there, and would make us a deed.

"Q. Who did he mean by 'us'? A. Me and W. L.

"Q. Was there anything else said in the conversation about it? A. Well I told him we would see around about it, and see what we could do about it.

"Q. Anything else he said? A. I promised to come back later when I had more time and look it over and see what we could do.

"Q. Was there anything else said? A. *I don't remember.*

"Q. Was there anything said in that conversation about what would be expected of you boys if he would make the deed to you? A. He wanted a place to stay where he could lay down and sleep and rest and feel at home.

"Q. When and where was the next time the question was brought up? A. Well, it was over at the old home place.

"Q. Who brought the conversation up that time? A. He did.

"Q. By 'he' you mean your father? A. Yes sir.

"Q. What did he say? A. Well, he wanted to know when we could fix it up.

"Q. What did he say in that regard? A. He said he wanted to fix up the papers.

"Q. Was that all that was said on that occasion about that? A. Bill asked him if he would deed the land to us and he said he would.

"Q. By Bill you mean your brother? A. Yes, W. L.

"Q. Wasn't anything else said on that occasion about it? A. Well, that is about all, *I guess*.

"Q. Now how long was that before the deed was made? A. A day before the deed was made."

In those excerpts from the testimony of defendants there is perhaps as much, if not more, written between the lines than is contained in them. The conveyance, as will be noted, first began to be talked of while Boyd Fuson was visiting his father and brother at the tenant house, but the proposition was so burdensome (?) on the prospective vendees that they had to take time to think it over, and, after that had been done, Boyd made another visit after the parties had moved into the old residence. By that time defendants had concluded to shoulder the task imposed upon them by the deed; i. e., to allow their father to live in his own house, and upon his own farm which was operated by and with his own stock and tools, as long as he lived, upon condition that he would deed to them the farm, but which they studiously avoided mentioning to any of the other children. In the meantime their more or less feeble-minded and aged father had become persuaded that it was a wise move on his part to convey away all of his property, leaving him penniless, in order for one of the defendants to live with him in his own residence, a relationship that existed at that time and had existed for some time prior thereto. The good faith (?) of defendants is shown by the fact that after the deed was executed they paid for their father a small physician's bill, bought him a pair of shoes and a shirt or two, and his son Boyd gave to him a discarded overcoat.

But it is insisted, and vigorously argued, that the daughters and another son, the barber, protested against the conveyance after they discovered it, and induced their father to file this action seeking its annulment or reformation so as to give him a monetary consideration therefor, and which is urged in defense of the action. We suspect that the charge so made was and is true, and at which there need be no great surprise or astonishment. Certainly it would not have the effect to destroy plaintiff's right of cancellation if in fact it existed, since we are cited to no law holding that one's legal rights are destroyed by the persuasion of others to assert them.

Without further discussion, we unhesitatingly conclude, not only that defendants failed to discharge the burden cast upon them by the rule supra, growing out of confidential relationship to their father, the grantor, but the evidence furthermore convinces us that he was actually overreached and procured to execute the deed in controversy contrary to his oft-expressed desires that all of his children should share equally in his property, and which he would not have done but for the chicanery and undue influence practiced upon him by defendants. It is true, as we have hereinbefore intimated, that no one expressly testified to any such influencing facts; but the circumstances detailed in the testimony, the facts gleaned from the statements made by defendants, plus their evident reluctance by their "not-rememberings," are all most persuasive that the attacked deed was not understandingly executed by plaintiff, nor was it the result of his free and untrammeled will, and all of which is sustained by his testimony. It follows that the court correctly so concluded and properly directed its cancellation.

Wherefore the judgment is affirmed.