320 S.E.2d 70

**Sue S. CRUMP**

v.

**BECKLEY NEWSPAPERS, INC.**

No. 15804.

Supreme Court of Appeals of West Virginia.

Nov. 10, 1983.

Concurring in Part and Dissenting in Part May 4, 1984.

Rehearing Refused July 11, 1984.

John S. Hrko, Mullens, for appellant.

Higgins & Gorman and Robert S. Kiss, Beckley, for appellee.

McGRAW, Chief Justice.

The appellant in this case, Sue S. Crump, appeals from an order of the Circuit Court of Raleigh County granting summary judgment for the defendant/appellee, Beckley Newspapers, Inc. She asserts that the tri-

al court erred in granting summary judgment because issues of material fact existed which should have been submitted for jury consideration. We agree and reverse the decision of the trial court.

On December 5, 1977, the defendant published an article in one of its newspapers concerning women coal miners. Photographs of the plaintiff, a miner with the Westmoreland Coal Company, taken with her knowledge and consent, were used by the defendant in conjunction with the article. Her name was specifically mentioned, and her picture appeared with Jacqueline Clements, another miner. After publication of this article in 1977, Crump had no contact with the defendant, and the defendant did not request permission to use her picture or name in any other newspaper article.

On September 23, 1979, an article entitled "Women Enter 'Man's' World" appeared in one of the defendant's newspapers. The article generally addressed some of the problems faced by women miners, and by women who desire employment in the mining industry. The article related incidents in which two Kentucky women were " 'stripped, greased and sent out of the mine' as part of an initiation rite"; in which a woman miner in southwestern Virginia was physically attacked twice while underground; and in which one Wyoming woman "was dangled off a 200-foot water tower accompanied by the suggestion that she quit her job. She did." The article also discussed other types of harassment and discrimination faced by women miners. Although Crump's name was not mentioned in the article, her 1977 photograph was used,[1] accompanied by a caption which read, "Women are entering mines as a regular course of action."

As a result of the unauthorized publication of Crump's photograph in conjunction with the article, she states in an affidavit submitted below that she was questioned by friends and acquaintances concerning the incidents contained in the article and concerning whether she had been the sub-

ject of any harassment by her employer or by fellow employees. She had, in fact, experienced no such harassment. Crump also states that the article caused one reader to ask her whether she had ever been "stripped, greased and sent out of the mine." She alleges that the unfavorable attention precipitated by the publication of her photograph in conjunction with the article has damaged her reputation and caused her a great deal of embarrassment and humiliation. Therefore, she seeks recovery from the defendant for damages resulting from their unauthorized publication of her photograph.

After receiving a letter from Crump complaining about the unauthorized use of her photograph, the defendant offered to either (1) print a story prepared by Crump, along with her picture, explaining her position in the matter; (2) print a letter to the editor written by Crump criticizing the way in which the story was handled; or (3) publish a clarification, identifying the woman pictured as the plaintiff, and stating that Crump had never experienced any of the problems mentioned in the article. Because Crump was temporarily unemployed and did not want to jeopardize her standing with her former employer, with whom she desired to resume employment when it became available, she did not wish to call any more attention to the matter. Therefore, she declined the newspaper's offers to clarify any false impression left by the article. Subsequently, on June 13, 1980, Crump filed an action in the Circuit Court of Raleigh County against the defendant alleging, in substance, defamation and invasion of privacy.

Upon defendant's motion for summary judgment, the trial court held that (1) because the issue of women entering the coal industry was a matter of general public interest, the defendant had a qualified privilege to publish Crump's photograph in connection with the article; (2) because the article did not contain any false or defamatory statements or, in fact, make any direct reference to the plaintiff other than

---

1. This photograph was not the one appearing in conjunction with the 1977 article, but was one

taken at that time by the newspaper's photographer.

through the juxtaposition of her photograph with the article, the defendant acted in good faith and did not exceed or abuse its conditional privilege; and (3) therefore, the unauthorized publication of Crump's photograph did not constitute libel as a matter of law. Thus, it granted summary judgment for the defendant.

Because the trial court (1) limited its analysis of whether a qualified privilege existed to the content of the article, and did not adequately consider whether the use of plaintiff's photograph alone was privileged; (2) ruled as a matter of law, despite evidence from which different inferences and conclusions might reasonably be drawn, that the defendant did not abuse its privilege; and (3) failed to adequately consider invasion of privacy as an alternative theory of recovery, summary judgment was inappropriate, and we must therefore reverse.

## I

The concept that a person's reputation in the community is precious[2] and should not be injured with impunity had been well established since ancient times. Slander was expressly forbidden by the law of Moses. *Exodus* 20:16 (King James) ("Thou shalt not bear false witness against thy neighbour."); *see also Deuteronomy* 19:16–21 (King James); M. NEWELL, THE LAW OF DEFAMATION, LIBEL AND SLANDER 2–4 (1890). The Law of the Twelve Tables, compiled approximately three hundred years after the founding of Rome, provided that, "whosoever slanders another by words or defamatory verses, and injures his reputation, shall be beaten with a club." *Id.* at 6. Under Alfred the Great, King of the Saxons at the end of the ninth century, "the slanderer's tongue was excised unless he could redeem it by payment of his *wer geld*, which was the price on his life." A. HANSON, LIBEL AND RELATED TORTS 2 (1969), *citing*, Veeder, *The History and Theory of the Law of*

*Defamation*, 3 Colum.L.Rev. 546, 549 (1903). Throughout the Middle Ages, the ecclesiastical courts exercised general jurisdiction over defamation, punishing it with penance. *See* W. PROSSER, THE LAW OF TORTS § 106, at 754–56 (1964). It was not until the reign of Henry VIII, that the common law courts began to exercise some jurisdiction over actions for defamation. By the end of the sixteenth century, however, common law courts exercised practically absolute jurisdiction over these actions. *See* Restatement (Second) of Torts § 568 comment b (1977).

From its adoption, our state constitution has provided for a cause of action for defamation. *See* W.VA. CONST. art. II, § 4 (1863). West Virginia's current constitutional provision states that, "No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties … provide … for the recovery, in civil actions, by the aggrieved party, of suitable damages for … libel, or defamation." W.VA. CONST. art. III, § 7. The importance of protection from reputational harm within our constitutional structure is also illustrated by the provision that, "The courts of this State shall be open, and every person, for an injury done to him, *in his person, property or reputation*, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." W.Va. Const. art. III, § 17 (emphasis added).

The adjudication of defamation actions has not been without difficulty. It has been said that,

No branch of the law has been more fertile of litigation than this (whether plaintiffs be more moved by a keen sense of honour, or by the delight of carrying on personal controversies under the protection and with the solemnities of civil justice), nor has any been more perplexed with minute and barren distinctions.

---

**2.** Perhaps William Shakespeare put it best:

Good name in man and woman, dear my lord is the immediate jewel of their souls: Who steals my purse steals trash; 'tis something, nothing 'twas mine, 'tis his and has been slave to thousands: But he that filches from me my

good name robs me of that which not enriches him and makes me poor indeed.
Shakespeare, Othello, Act. III, Scene 3. *See also Ecclesiastes* 7:1 (King James) ("A good name is better than precious ointment.").

F. POLLOCK, THE LAW OF TORTS 243 (1929); *see also* Courtney, *Absurdities of the Law of Slander and Libel,* 36 Am.L. Rev. 552 (1902). Recently, the increased role played by the first amendment in defamation cases has heightened the sense of confusion surrounding their disposition. *See Havalunch, Inc. v. Mazza,* 170 W.Va. 268, 294 S.E.2d 70, 73 (1981). Despite these complexities, however, some of the basic elements of defamation causes of action and defenses have become fairly well defined.

■ In West Virginia, the essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury. *See Havalunch, Inc. v. Mazza,* 170 W.Va. at 270–272, 294 S.E.2d at 73–74; *see also* Restatement (Second) of Torts § 558 (1977). A statement may be described as defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977); *see also* syl. pt. 1, *Sprouse v. Clay Communications, Inc.,* 158 W.Va. 427, 211 S.E.2d 674 (1975), *cert. denied,* 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107, *reh. denied,* 423 U.S. 991, 96 S.Ct. 406, 46 L.Ed.2d 311 (statements are defamatory if they tend to "reflect shame, contumely, and disgrace upon [the plaintiff]"). Direct defamatory statements are not an absolute prerequisite to recovery, however, because defamation may also be accomplished through inference, implication, innuendo or insinuation. *See State v. Aler,* 39 W.Va. 549, 20 S.E. 585 (1894); *Johnson v. Brown,* 13 W.Va. 71 (1878); *see also Neal v. Huntington Pub. Co.,* 159 W.Va. 556, 223 S.E.2d 792, 796 (1976). In determining whether a particular defendant is liable to a private individual for defamation, in the absence of a privileged communication, the standard is one of negligence, and the conduct of the defendant is to be measured against what a reasonably prudent person would have done under the same or similar circumstances.[3] *See Havalunch, Inc. v. Mazza, supra; see also* Restatement (Second) of Torts § 283 (1977).

■ A defamation defendant, of course, has various defenses which can be asserted. Two of these defenses, privilege and truth, allow a defendant to avoid all liability once established. There are two classes of privileges available in defamation actions: absolute and qualified. Absolute privilege is limited to those situations "where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." W. PROSSER, THE LAW OF TORTS 796 (1964). This Court has stated,

> An absolute privileged communication is one in respect of which, by reason of the occasion on which, or the matter in reference to which, it is made, no remedy can be had in a civil action, however hard it may bear upon a person who claims to be injured thereby, and even though it may have been made maliciously.

*City of Mullens v. Davidson,* 133 W.Va. 557, 563, 57 S.E.2d 1, 6 (1949), *quoting,* 33 Am.Jur. *Libel and Slander* § 125. The scope of absolute privilege is confined within fairly narrow limits. "With a few exceptions ... absolutely privileged communications are limited to legislative, judicial and quasi-judicial proceedings and other acts of the State." *Parker v. Appalachian Electric Power Co.,* 126 W.Va. 666, 672, 30 S.E.2d 1, 4 (1944). Absolute privilege situ-

---

**3.** Although only simple negligence is required for the recovery of actual damages under this formulation, either an intentional publication of false defamatory material or a publication of false defamatory material in reckless disregard for its truth or falsity must be present before punitive damages may be recovered. Syl. pt. 1, *Havalunch, Inc. v. Mazza, supra.* Of course, when the plaintiff is either a public official or a public figure, he may not recover any damages for the publication of a false defamatory statement "unless he proves that the statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964); *Curtis Pub. Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extending the *New York Times* standard to include public figures).

ations also include (1) where a plaintiff has consented to the defamation or instigated the publication of defamatory statements, *see, e.g., Walters v. Linhof,* 559 F.Supp. 1231 (D.Colo.1983); *Johnson v. Buckner,* 610 S.W.2d 406 (Mo.App.1980); *Hollowell v. Career Decisions, Inc.,* 100 Mich.App. 561, 298 N.W.2d 915 (1980); (2) where the broadcast of statements made by political candidates is involved, *see Farmers Educational and Co-op Union of America v. WDAY, Inc.,* 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959); and (3) where a petitioning of the government for a redress of grievances protected by the first amendment is involved, *see Webb v. Fury,* 167 W.Va. 434, 282 S.E.2d 28 (1981).

Qualified privileges are "based upon a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public." Restatement (Second) of Torts, Topic 3: Conditional Privileges, Title A: Occasions Making a Publication Conditionally Privileged, Scope Note (1977). This Court has stated that, "A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter. *Swearingen v. Parkersburg Sentinel Co.,* 125 W.Va. 731, 744, 26 S.E.2d 209, 215 (1943). *See also England v. Daily Gazette Co.,* 143 W.Va. 700, 104 S.E.2d 306 (1958)." *Mauck v. City of Martinsburg,* 167 W.Va. 332, 280 S.E.2d 216, 221 (1981). Although motive is irrelevant when an absolute privilege is involved, a bad motive will defeat a qualified privilege defense. As this Court stated in Syllabus Point 1 of *England v. Daily Gazette Co., supra,* "In an action of libel based on a publication qualifiedly privileged, an abuse of the privilege destroys the protective characteristics of the privilege."

The primary manner in which a qualified privilege to publish defamatory statements may be defeated is by a showing of actual malice. *See City of Mullens v. Davidson, supra.* A qualified privilege, however, may also be defeated by a showing of (1) an intentional publication of false defamatory material, *see Spencer v. Community Hospital of Evanston,* 87 Ill. App.3d 214, 42 Ill.Dec. 272, 408 N.E.2d 981 (1980); *Neufeld v. Schachner,* 61 A.D.2d 952, 403 N.Y.S.2d 41 (1978); *Mercedes-Benz of North America, Inc. v. Finberg,* 58 A.D.2d 808, 396 N.Y.S.2d 260 (1977); (2) a publication of false defamatory material in reckless disregard for its truth or falsity, *see Luster v. Retail Credit Co.,* 575 F.2d 609 (8th Cir.1978); *Bender v. City of Seattle,* 99 Wash.2d 582, 664 P.2d 492 (1983); *Holter v. WLCY T.V., Inc.,* 366 So.2d 445 (Fla.App.1978); (3) a publication of false defamatory material made to persons who have no reason to receive the information, *see Dillard Dept. Store, Inc. v. Felton,* 276 Ark. 304, 634 S.W.2d 135 (1982); *Shallenberger v. Scoggins-Tomlinson, Inc.,* 439 N.E.2d 699 (Ind.App.1982); *Sullivan v. Birmingham,* 11 Mass.App. 359, 416 N.E.2d 528 (1981); and (4) a publication of false defamatory material with a primary purpose unrelated to the purpose of the privilege, *see Wheeler v. Green,* 286 Or. 99, 593 P.2d 777 (1979).

Some examples of the types of situations in which a qualified privilege has been recognized include (1) the publication of defamatory material for the protection or advancement of the defendant's own legitimate interests, *see, e.g., Haycox v. Dunn,* 200 Va. 212, 104 S.E.2d 800 (1958) (defense against injury to one's reputation by another); *Faber v. Byrle,* 171 Kan. 38, 229 P.2d 718 (1951) (attempt to recover stolen property); *Powell v. Young,* 151 Va. 985, 144 S.E. 624 (1928) (protection of business against unreasonable competition); (2) the publication of defamatory material for the protection of the legitimate interests of others, *see, e.g., Cash Drug Store v. Cannon,* 47 S.W.2d 861 (Tex.Civ., App.1932) (physician speaking to protect interest of patient); *Snyder v. Fatherly,* 153 Va. 762, 151 S.E. 149 (1930) (agent or employee speaking to protect interest of principal or employer); *Harriott v. Plimpton,* 166 Mass. 585, 44 N.E. 992 (1892) (advising member of family not to marry one be-

lieved to be a scoundrel); (3) where the communication between the publisher and the recipient is designed to promote a mutual interest, *see, e.g., Henderson v. Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local 313,* 98 Wash.2d 666, 585 P.2d 147 (1978) (communications between union members concerning qualifications of officers); *Thomas v. Kaufmann's,* 436 F.Supp. 293 (W.D.Pa.1977) (communications concerning employee between agent, servants and employees of the employer when honestly made); *Dangberg v. Sears, Roebuck & Co.,* 198 Neb. 234, 252 N.W.2d 168 (1977) (discussion between store employees concerning suspected shoplifter); (4) where the communication is made to one discharged with the performance of a public duty, *see, e.g., Zarate v. Cortinas,* 553 S.W.2d 652 (Tex.Civ.App.1977) (communication of alleged wrongful act to official authorized to protect the public against such acts); *Danias v. Fakis,* 261 A.2d 529 (Del. Super.1969) (report to immigration authorities of suspected illegal presence); *Fuson v. Fuson,* 247 Ky. 380, 57 S.W.2d 42 (1933) (complaints made by parents concerning competence or conduct of teachers to members of school board); (5) reports of public proceedings, *see, e.g., Morton v. Stewart,* 153 Ga.App. 636, 266 S.E.2d 230 (1980) (reporting proceedings of judicial bodies); *Medico v. Time, Inc.,* 509 F.Supp. 268 (E.D. Pa.1980), *aff'd,* 643 F.2d 134 (3rd Cir.1981) (reporting substance of confidential Federal Bureau of Investigation report); *Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978) (publication of photograph of individual identified by a police department as a suspect in a crime); and (6) fair comment on matters of public concern, *see, e.g., Havalunch, Inc. v. Mazza, supra* (discussion of matters of general public interest); *England v. Daily Gazette Co., supra* (commentary on the character and conduct of public officers and employees); *Sweeney v. Baker,* 13 W.Va. 158 (1878) (commentary on candidates for political office).

■ The second complete defense to an allegation of defamation is truth. Article III, § 8 of the West Virginia Constitution provides, "In ... civil suits for libel, the truth may be given in evidence; and if it shall appear to the jury, that the matter charged as libelous, is true, and was published with good motives, and for justifiable ends, the verdict shall be for the defendant." This formulation is a somewhat modified form of the traditional common law defense. *See* W. PROSSER, THE LAW OF TORTS 824 (1964). Under this provision, the alleged defamatory communication must not only be true, but must also have been published "with good motives, and for justifiable ends." *See Michaelson v. Turk,* 79 W.Va. 31, 90 S.E. 395 (1916). If these three criteria are established, even if the communication complained of is defamatory and actual malice is present, the plaintiff cannot recover. *See England v. Daily Gazette Co.,* 143 W.Va. at 716, 104 S.E.2d at 315.

■ One important partial defense in actions for defamation is that of mitigation. Three types of mitigating circumstances have been recognized in West Virginia. In Syllabus Point 6 of *Alderson v. Kahle,* 73 W.Va. 690, 80 S.E. 1109 (1914), this Court stated, "[I]ntoxication of the defendant at the time of his use of the slanderous words is a mitigating circumstance proper for the consideration of the jury in estimating the damages." Similarly, in Syllabus Point 7 of *Alderson,* the Court stated, "Provocation by the plaintiff, inducing the utterance of the slanderous words, is a mitigating circumstance also." Finally, in *Milan v. Long,* 78 W.Va. 102, 105, 88 S.E. 618, 619 (1916), the Court held that while a retraction or apology does not exonerate a publisher from liability for defamation, it is a mitigating factor in the assessment of damages.

■ Turning to the facts surrounding the present case, it is well established that although libel is generally perpetrated by written communication, it also includes defamation through the publication of pictures or photographs. *See Burton v. Crowell Pub. Co.,* 82 F.2d 154 (2d Cir.1936); *Thayer v. Worcester Post Co.,* 284 Mass. 160, 187 N.E. 292 (1933); *Dunlop v. Dunlop Rubber Co.,* 1 Ir.Rep. 280 (1920); *Pavesich v.*

*New England Life Ins. Co.,* 122 Ga. 190, 50 S.E. 68 (1904); *Morrison v. Smith,* 177 N.Y. 366, 69 N.E. 725 (1904); *De Sando v. New York Herald Co.,* 88 A.D. 492, 85 N.Y.S. 111 (1903); *DuBost v. Beresford,* 2 Camp. 511, 170 Eng.Rep. 1235 (1810).

In *Wandt v. Hearst's Chicago American,* 129 Wis. 419, 109 N.W. 70 (1906), the defendant newspaper published an article accusing a certain person of being a "suicide fiend," mistakenly accompanied by a photograph of the plaintiff. The Supreme Court of Wisconsin held that, even though the name of the person referred to as a "suicide fiend" was given, the juxtaposition of the plaintiff's photograph with the article was, in effect, a statement that the plaintiff was a "suicide fiend." 129 Wis. at 421, 109 N.W. at 71.

In *Peck v. Tribune Co.,* 214 U.S. 185, 29 S.Ct. 554, 53 L.Ed. 960 (1909), the plaintiff's picture was published by the defendant accompanied by a caption which read, "Nurse and Patients Praise Duffy's—Mrs. A. Schuman, One of Chicago's Most Capable and Experienced Nurses, Pays an Eloquent Tribute to the Great Invigorating, Life-Giving and Curative Properties of Duffy's Pure Malt Whiskey ...," followed by an endorsement which read, "After years of constant use of your Pure Malt Whiskey, both by myself and as given to patients in my capacity as nurse, I have no hesitation in recommending it as the very best tonic and stimulant for all weak and rundown conditions ...." The plaintiff "was not Mrs. Schuman, was not a nurse, and was a total abstainer from whiskey and all spirituous liquors." 214 U.S. at 188, 29 S.Ct. at 555, 53 L.Ed. at 962. In an opinion by Justice Holmes, the United States Supreme Court reversed the granting of a directed verdict for the defendant by the trial court, and held that the plaintiff was entitled to prove her case and have the issue of whether the unauthorized use of her picture was libelous go to the jury. 214 U.S. at 190, 29 S.Ct. at 556, 53 L.Ed. at 963.

■ As noted previously, this Court has recognized that defamation may be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference. In Syllabus Point 4 of *Neal v. Huntington Pub. Co., supra,* this Court stated, "Whether a written defamatory statement refers to a particular plaintiff, normally, is a question of fact for a jury." As the *Wandt* and *Peck* cases demonstrate, even if the alleged defamatory material refers to another, if the implication is one of identity, the plaintiff may recover. Although it does not appear in the present case that the article involved in any way implied that the plaintiff had experienced any of the types of harassment described therein, her allegations, supported by affidavit, were sufficient to raise a genuine issue of material fact for jury consideration.

■ In addressing whether a qualified privilege existed which supported publication of Crump's photograph, the trial court held that because women entering the coal industry was a matter of general public interest, the publication constituted "fair comment." Without passing upon the issue of whether a qualified privilege did exist in this case, the Court notes that because the trial court limited its analysis to the content of the article, and did not consider whether the use of Crump's photograph alone was privileged, its finding of a qualified privilege was inappropriate.

An appropriate analysis of the status of the publication of Crump's photograph as an illustration to the article involved requires an inquiry into its relevance, impact and value. Simply holding that the subject matter of the article was privileged was insufficient. A more thorough analysis of the relationship between the photograph and the article is required. Such factors as whether it adds credibility, contributes to reader perception and understanding, or draws attention to the story are all relevant to such a determination. In Syllabus Point 3 of *Swearingen v. Parkersburg Sentinel Co., supra,* this Court stated, "The existence or nonexistence of a qualifiedly privileged occasion, ... in the absence of controversy as to the facts, [is a] question[ ] of law for the court." Upon remand, the issue for the trial court will be

whether the unauthorized publication of Crump's photograph was sufficiently in the public interest due to its relationship to the subject matter of the article or whether its publication was supported by some other qualified privilege, and not whether the content of the article apart from its connection with the publication of Crump's photograph was privileged.

In addition to its finding of a qualified privilege, the trial court also held that the defendant did not abuse its privilege to publish Crump's photograph. In *Parker v. Appalachian Electric Power Co.*, 126 W.Va. at 672, 30 S.E.2d at 4, this Court stated, "Whether a conditionally privileged occasion was exceeded is a question of law for the court or fact for the jury, and depends upon the absence or existence of a controversy as to facts bearing thereon." *See also Swearingen, supra;* syl. pt. 2, *Stewart v. Riley*, 114 W.Va. 578, 172 S.E. 791 (1934). In the present action, the plaintiff claims that the defendant published the alleged defamatory statements either knowing them to be false or in reckless disregard for their truth or falsehood. The defendant does not directly respond to these allegations because it contends that the article did not imply that the plaintiff suffered any of the harassment described and was therefore not false. If upon remand the trial court finds a qualified privilege to be present, this controversy as to the underlying truth or falsity of the statements contained in the presentation of Crump's photograph with the article makes the issue of abuse of privilege one for the jury. The key factual issue upon remand in relationship to Crump's defamation cause of action is whether the article involved implied that she had suffered any harassment in the course of her employment in the mining industry by its juxtaposition of her photograph.

## II

Although closely related, defamation and invasion of privacy remain distinct theories of recovery entitled to separate consideration. Possessing different historical antecedents, each requires different elements of proof. Despite the lack of clarity in the plaintiff's complaint, it is clear that it sufficiently stated a cause of action for invasion of privacy meriting its consideration by the trial court. Therefore, it is necessary to develop the theory and to analyze the facts presented in order to determine whether genuine issues of material fact remain.

Compared to the ancient origins of the law of defamation, the law of privacy is a relatively recent phenomenon. In 1890, in what is perhaps the most influential article ever published in an American law journal, Samuel D. Warren and Louis D. Brandeis propounded a concept of a right to privacy which they asserted justified an independent tort remedy. Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890). Their classic definition of that right was that it was based on "the right 'to be let alone.'" [4] *Id.* at 195, *quoting,* T. COO-

---

4. A central purpose of this "right of privacy" as developed by Warren and Brandeis was that a remedy should be provided for the abuses which resulted from an overactive press publishing essentially private information. They complained,

> The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle. The intensity and complexity of life, at-

tendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury. Nor is the harm wrought by such invasions confined to the suffering of those who may be made the subjects of journalistic or other enterprise. In this, as in other branches of commerce, the supply creates the demand. Each crop of unseemly gossip, thus harvested, becomes the seed of more, and, in direct proportion to its circulation, results in a lowering of social standards and of morality. Even gossip ap-

LEY, THE LAW OF TORTS 29 (1888); *see also* syl. pt. 1, *Roach v. Harper*, 143 W.Va. 869, 105 S.E.2d 564 (1958). Somewhat paradoxically, although Warren's and Brandeis' primary object was "to establish that the right of privacy was part of the existing common law; in the process of searching for this right, they succeeded in inventing it." Felcher & Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*, 88 YALE L.J. 1577, 1581 (1979). In only thirteen years, New York became the first state to enact a statutory privacy action provision, after a public outcry to reverse an unpopular court decision denying a privacy recovery to a young woman whose picture was used to advertise a brand of flour without her permission. 1903 N.Y.LAWS ch. 132, §§ 1–2 [currently found at N.Y.CIV.RTS.LAW §§ 50–51 (McKinney 1976)]; *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902). A short time later, Georgia and Louisiana judicially recognized a right to privacy. *Pavesich v. New England Life Ins. Co., supra; Itzkovitch v. Whitaker*, 115 La. 479, 39 So. 499 (1905). At present, every state has recognized some form of privacy action, either by statute or through case law. *See* Note, *Tort Recovery for Invasion of Privacy*, 59 Neb.L.Rev. 808, 809 (1980) (Nebraska was the last state to provide for invasion of privacy recovery, *see* 1979 NEB.LAWS LB 394).

Although Warren and Brandeis created the idea of a right of privacy, Dean William L. Prosser was the major influence on its current formulation. In a law review article published in 1960, Dean Prosser proposed,

What has emerged from the decisions is no simple matter. It is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff, in the phrase coined by Judge Cooley, "to be let alone."

Prosser, *Privacy*, 48 Calif.L.Rev. 383, 389 (1960) (footnote omitted).

Prosser's influential analysis, which has subsequently been adopted by the Restatement (Second) of Torts and by a number of states whether by statute or by court decision, divided the tort of invasion of privacy into the following four categories: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public. *See* Prosser, 48 Calif.L.Rev. at 389; W. PROSSER, THE LAW OF TORTS § 117 (1971); Restatement (Second) of Torts §§ 652A–652–E (1977).

Although there are obviously a number of similarities between the right to privacy and the law of defamation, particularly when a "false light" invasion of privacy is involved, there are also important differences which reflect the nature of the interests protected by each. As identified by Professor Thomas I. Emerson,

Three major differences should be noted. In defamation law only statements that are false are actionable, truth is, almost universally, a defense. In privacy law, other than in false light cases, the facts published are true; indeed it is the very truth of the facts that creates the claimed invasion of privacy. Secondly, in defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or per-

parently harmless, when widely and persistently circulated, is potent for evil. It both belittles and perverts. It belittles by inverting the relative importance of things, thus dwarfing the thoughts and aspirations of a people. When personal gossip attains the dignity of print, and crowds the space available for matters of real interest to the community, what wonder that the ignorant and thoughtless mistake its relative importance. Easy of compre-

hension, appealing to that weak side of human nature which is never wholly cast down by the misfortunes and frailties of our neighbors, no one can be surprised that it usurps the place of interest in brains capable of other things. Trivality destroys at once robustness of thought and delicacy of feeling. No enthusiasm can flourish, no generous impulse can survive under its blighting influence.
4 Harv.L.Rev. at 196.

sonal, in the outside world. In privacy cases the interest affected is the subjective one of injury to inner person. Thirdly, where the issue is truth or falsity, the marketplace of ideas furnishes a forum in which the battle can be fought. In privacy cases, resort to the marketplace simply accentuates the injury.

Emerson, *The Right of Privacy and Freedom of the Press*, 14 Harv.C.R.–C.L.L.Rev. 329, 333 (1979).

As in the law of defamation, a defendant in an invasion of privacy suit has several defenses which may be asserted. Two of these defenses, newsworthiness and consent, allow a defendant to avoid all liability once established.[5] There are two classes of newsworthy subjects which are privileged under privacy law: public figures and matters of legitimate public interest. In making a determination as to "public figure" status, the inquiry "focuses on the person to whom the publicity relates and asks whether the individual either by assuming a role of special prominence in the affairs of society or by thrusting himself to the forefront of a particular public controversy ... has become a public figure." *Campbell v. Seabury Press*, 614 F.2d 395, 397 (5th Cir.1980); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). In *Palmer v. Schonhorn Enterprises, Inc.*, 96 N.J.Super. 72, 76, 232 A.2d 458, 460 (1967), the court defined "public figure" as "a person who, by his accomplishments, fame or mode of living, or by adopting a profession or calling which gives the public a legitimate interest in his doings, his affairs and his character, has become a public personage."

Although a person may not actively seek publicity, he or she may become a public personage by the force of consequences which make his or her activities of legitimate interest to the public. *See Adreani v. Hansen*, 80 Ill.App.3d 726, 36 Ill.Dec. 259, 400 N.E.2d 679 (1980); *Emerson v. J.F. Shea Co., Inc.*, 143 Cal.Rptr. 170, 76 Cal.App.3d 579 (1978); *Beresky v. Teschner*, 64 Ill.App.3d 848, 21 Ill.Dec. 532, 381 N.E.2d 979 (1978). The "public figure" doctrine in privacy law operates in the same manner as qualified privileges operate in defamation law. Although normally a bar to recovery, the "public figure" privilege may be lost through abuse, excess or actual malice. For example, the fact that one engages in an activity in which the public has a general interest does not render every aspect of one's life subject to public scrutiny. *See Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir.1975).

In determining whether a manner of legitimate public interest is involved, the inquiry "focuses on the information disclosed by the publication and asks whether truthful information of legitimate concern to the public is publicized in a manner that is not highly offensive to a reasonable person." *Campbell v. Seabury Press*, 614 F.2d at 397; *see also Valentine v. C.B.S., Inc.*, 698 F.2d 430, 433 (11th Cir.1983). "Public interest" includes both the dissemination of current events and any "informational material of legitimate public interest." *Buzinski v. Do-All Co.*, 31 Ill.App.2d 191, 195, 175 N.E.2d 577, 579 (1961); *see also* W. PROSSER, THE LAW OF TORTS § 117 (1971). As with the "public figure" doctrine, the "public interest" doctrine acts as a qualified privilege which immunizes a publisher from liability so long as abuse of privilege or actual malice are not present.

The second important category of defenses available in privacy cases is consent. As in other tort actions, consent to

---

5. It should be noted that the same absolute and qualified privilege defenses which are available in defamation actions are also available in right to privacy actions. *See* Restatement (Second) of Torts §§ 652F and 652G (1977); *Bond v. Pecaut*, 561 F.Supp. 1037 (N.D.Ill.1983); *Netterville v. Lear Siegler, Inc.*, 397 So.2d 1109 (Miss.1981);

*McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882 (Ky.1981); *Dijkstra v. Westerink*, 168 N.J.Super. 128, 401 A.2d 1118 (1979); *Devlin v. Greiner*, 147 N.J.Super. 446, 371 A.2d 380 (1977); *Froelich v. Adair*, 213 Kan. 357, 516 P.2d 993 (1973).

the invasion of privacy will bar recovery. *See Anderson v. Low Rent Housing Commission*, 304 N.W.2d 239 (Iowa 1981); *Dietemann v. Time, Inc.*, 284 F.Supp. 925 (C.D.Calif.1968), *aff'd*, 449 F.2d 245 (9th Cir.1971); *Vespa v. Safety Federal Savings & Loan Ass'n*, 219 Kan. 578, 549 P.2d 878 (1976); *Volk v. Auto-Dine Corp.*, 177 N.W.2d 525 (N.D.1970). Consent may be given either expressly, or impliedly, such as when a person poses for a picture with knowledge of the purposes for which it is to be used. *See Shields v. Gross*, 58 N.Y.2d 338, 461 N.Y.S.2d 254, 448 N.E.2d 108 (1983) (nude photographs of 10-year old aspiring actress consented to by mother); *Gill v. Hearst Pub. Co.*, 40 Cal.2d 224, 253 P.2d 441 (1953); *Johnson v. Boeing Airplane Co.*, 175 Kan. 275, 262 P.2d 808 (1953); *Thayer v. Worcester Pub. Co., supra*. However, as with any other qualified privilege, conduct in excess of that consented to is not protected. For example, in *McCabe v. Village Voice, Inc.*, 550 F.Supp. 525, 529–30 (E.D.Pa.1982), the court held that although the plaintiff consented to be photographed in the nude in a bathtub by a photographer who said that "he wanted to publish a book," that consent did not extend to a publication of the photograph in a weekly newspaper. *See also* Annot., Waiver or Loss of Right of Privacy, 57 A.L.R.3d 16, § 3 (1974); *Dzurenko v. Jordache, Inc.*, 59 N.Y.2d 788, 464 N.Y.S.2d 730, 451 N.E.2d 477 (1983).

■ An additional aspect of privacy actions which prevents recovery in certain circumstances is the restriction of the protection afforded by the law of privacy to persons of ordinary or reasonable sensibilities. *See Emerson v. J.F. Shea Co., Inc., supra; Garris v. Schwartz*, 551 F.2d 156 (7th Cir.1977); *Johnson v. Board of Jr. College Dist. No. 508*, 31 Ill.App.3d 270, 334 N.E.2d 442 (1975). The protection given does not extend to the supersensitive. *See Cape Publications, Inc. v. Bridges*, 423 So.2d 426 (Fla.App.1982); *Bitsie v. Walston*, 85 N.M. 655, 515 P.2d 659, *cert. denied*, 85 N.M. 639, 515 P.2d 643 (1973); *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956); *Davis v. General Finance & Thrift Corp.*, 80 Ga.App. 708, 57 S.E.2d 225 (1950).

■ Recognition of the right of privacy in West Virginia, although somewhat undeveloped, is nevertheless well established. *See Cantrell v. Forest Pub. Co.*, 419 U.S. 245, 248 n. 2, 95 S.Ct. 465, 468 n. 2, 42 L.Ed.2d 419, 425 n. 2 (1974). In Syllabus Point 1 of *Roach v. Harper*, 143 W.Va. 869, 105 S.E.2d 564 (1958), this Court stated, "The right of privacy, including the right of an individual to be let alone and to keep secret his private communications, conversations and affairs, is a right the unwarranted invasion or violation of which gives rise to a common-law right of action for damages." *See also Sutherland v. Kroger Co.*, 144 W.Va. 673, 110 S.E.2d 716 (1959).

Although the Court in *Roach* did not attempt to precisely define the concept, it is clear that its perception of the parameters of the right included the four categories which Dean Prosser distilled from the existing body of case law two years later. Therefore, in West Virginia, an "invasion of privacy" includes (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public. *See* Restatement (Second) of Torts §§ 652A–652E (1977). The Court's analysis in *Roach* also indicates that the types of defenses recognized elsewhere are available in privacy actions in West Virginia. Therefore, in West Virginia, the "right of privacy" does not extend to communications which are privileged under the law of defamation; which concern public figures or matters of legitimate public interest; or which have been consented to by the plaintiff. Additionally, the protection afforded by the law of privacy is restricted to persons of ordinary or reasonable sensibilities, and does not extend to the supersensitive.

Turning to the facts in the present case, the plaintiff complains that the unauthorized use of her photograph by the defendant constituted an appropriation and placed her in a false light before the public.

Therefore, it is necessary to analyze both of these theories of recovery in order to determine whether material facts remain which preclude summary judgment.

 Because it initiated judicial and legislative recognition of a right of privacy in *Pavesich* and the New York statute which resulted from the public outcry following the decision in *Roberson,* appropriation of another's name or likeness is the most developed of the four privacy theories of recovery. The right has primarily served to prevent the emotional harm which results from the unauthorized use of an individual's name or likeness to promote a particular product or service.[6] *See, e.g., Pavesich, supra; Jeppson v. United Television, Inc.,* 580 P.2d 1087 (Utah 1978); *Tooley v. Canal Motors, Inc.,* 296 So.2d 453 (La.App.1974); *Canessa v. J.I. Kislak, Inc.,* 97 N.J.Super. 327, 235 A.2d 62 (1967); *Olan Mills, Inc. v. Dodd,* 234 Ark. 495, 353 S.W.2d 22 (1962); *Flores v. Mosler Safe Co.,* 7 N.Y.2d 276, 164 N.E.2d 853, 196 N.Y.S.2d 975 (1959); *Munden v. Harris,* 153 Mo.App. 652, 134 S.W. 1076 (1911). However, this prohibition also extends to other situations in which a person's name or likeness is appropriated to the noncommercial advantage of another.[7] *See, e.g., Goodyear Tire & Rubber Co. v. Vandergriff,* 52 Ga.App. 662, 184 S.E. 452 (1936) (impersonation to obtain credit or secret information); *Burns v. Stevens,* 236 Mich.

443, 210 N.W. 482 (1926) (impersonation of plaintiff's wife); *Vanderbilt v. Mitchell,* 72 N.J.Eq. 910, 67 A. 97 (1907) (misrepresentations to physician concerning paternity of child for birth certificate purposes). In spite of these unusual situations, the bulk of appropriation cases involve commercial use.

The prohibition against the appropriation of another's name or likeness is subject to limitations imposed by important first amendment considerations. Comment d to section 652C of the Restatement (Second) of Torts (1977) summarizes the position taken by the overwhelming majority of jurisdictions:

> The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name or appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or likeness that the publicity protects the commercial value of a name or likeness.

---

6. This "right of privacy" is not to be confused with the "right of publicity" first recognized in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir.1953), which remedies the unjust enrichment caused by an unauthorized exploitation of the good will and reputation that a public figure develops in his name or likeness through the investment of time, money and effort. *See also Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977); *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831 (6th Cir.1983); *Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc.,* 694 F.2d 674 (11th Cir.1983); *Cher v. Forum International, Ltd.,* 692 F.2d 634 (9th Cir.1982); *Groucho Marx Productions, Inc. v. Day and Night Co.,* 689 F.2d 317 (2nd Cir. 1982); *Bi-Rite Enterprises, Inc. v. Button Master,* 555 F.Supp. 1188 (S.D.N.Y.1983); *Kamakazi Music Corp. v. Robbins Music Corp.,* 534 F.Supp. 69 (S.D.N.Y.1982). The right of privacy protects individual personality and feelings, the right of

7. There is also a large body of case law in which plaintiffs have recovered for invasions of privacy resulting from the publication of their photographs which are highly offensive and of no legitimate concern to the public. *See, e.g., National Bonding Agency v. Demeson,* 648 S.W.2d 748 (Tex.App.1983) (publication of "wanted" poster, describing the plaintiff as a bond jumper and referring to her sexual habits); *Daily Times Democrat v. Graham,* 276 Ala. 380, 162 So.2d 474 (1964) (picture showing plaintiff with her dress blown up by air jets in a fun house at a county fair, exposing her body from the waist down except for the part covered by her panties); *Bazemore v. Savannah Hospital,* 171 Ga. 257, 155 S.E. 194 (1930) (publication of a nude post mortem picture of a child born with his heart outside his body who died following surgery).

right of privacy is invaded. The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks a profit, is not enough to make the incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable ... to every person whose name or likeness it publishes.

*See also Valentine v. C.B.S., Inc.*, 698 F.2d at 433 ("Use of a name is not harmful simply because it is included in a publication sold for profit."); *Bisbee v. John C. Conover Agency, Inc.*, 186 N.J.Super. 335, 452 A.2d 689 (1982); *Loft v. Fuller*, 408 So.2d 619 (Fla.App.1982); *Tropeano v. Atlantic Monthly Co.*, 379 Mass. 745, 400 N.E.2d 847 (1980); *Lopez v. Triangle Communications, Inc.*, 70 A.D.2d 359, 421 N.Y. S.2d 57 (1979); *Bass v. Straight Arrow Publishers, Inc.*, 59 A.D.2d 684, 398 N.Y. S.2d 669 (1977); *Nelson v. Maine Times*, 373 A.2d 1221 (Me.1977); *Everett v. Carvel Corp.*, 70 Misc.2d 734, 334 N.Y.S.2d 922 (1972).

In order for a communication to constitute an appropriation, mere publication of a person's name or likeness is not enough, the defendant must take for his own use or benefit the reputation, prestige or commercial standing, public interest or other value associated with the name or likeness published. In the present case, Crump's photograph was not published because it was *her* likeness, it was published because it was the likeness of a *woman coal miner*. It was merely a file photograph used as a matter of convenience to illustrate an article on women coal miners. This type of incidental use is not enough to make the publication of a person's photograph an appropriation. Therefore, Crump is not entitled to recover under the appropriation theory of recovery as a matter of law.

The second privacy theory of recovery which Crump advances is that of false light. As previously noted, publicity which unreasonably places another in a false light before the public is an actionable invasion of privacy. One form in which false light invasions of privacy often appears is the use of another's photograph to illustrate an article or book with which the person has no reasonable connection, and which places the person in a false light. For example, in *Leverton v. Curtis Pub. Co.*, 192 F.2d 974 (3d Cir.1951), a photograph of a child being helped to her feet after nearly being struck by an automobile through no fault of her own was initially published in a local newspaper. Approximately twenty months later, however, in an article published in the *Saturday Evening Post* on the role of pedestrian carelessness in traffic accidents, the plaintiff's photograph was used as an illustration of such carelessness. The Third Circuit affirmed the jury verdict for the plaintiff, holding that her privacy had been invaded because she had been presented in a false light. 192 F.2d at 978. Other examples of communications which have been held to constitute false light invasions of privacy include where a photograph of an honest taxi driver was used to illustrate an article on unscrupulous taxi drivers, *Peay v. Curtis Pub. Co.*, 78 F.Supp. 305 (D.D.C.1948); where a photograph of a husband and wife in an affectionate pose taken without their permission or knowledge was used to illustrate an article which stated that "love at first sight" was founded upon one hundred percent sex attraction and would be followed by divorce, *Gill v. Curtis Pub. Co.*, 38 Cal.2d 273, 239 P.2d 630 (1952); publication of a photograph depicting the plaintiff as a member of a gang of juvenile delinquents, *Metzger v. Dell Pub. Co.*, 207 Misc. 182, 136 N.Y.S.2d 888 (1955); and where the plaintiff posed as a model for fashion pictures to appear in the defendant's *Ebony* magazine, but where the defendant used her picture to illustrate a story entitled "Man Hungry" appearing in an issue of *Tan* magazine, *Martin v. Johnson Pub. Co.*, 157 N.Y.S.2d 409 (N.Y.Sup.1956).

There are obviously a number of similarities between actions for false light invasion of privacy and actions for defamation. The most prominent characteristic shared by the two causes of action is

that the matter publicized as to the plaintiff must be untrue. *See Cibenko v. Worth Publishers, Inc.*, 510 F.Supp. 761 (D.N.J.1981); *Fogel v. Forbes, Inc.*, 500 F.Supp. 1081 (E.D.Pa.1980); *Rinsley v. Brandt*, 446 F.Supp. 850 (D.Kan.1977), *aff'd*, 700 F.2d 1304 (10th Cir.1983); *Renwick v. News and Observer Pub. Co.*, 63 N.C.App. 200, 304 S.E.2d 593 (1983); *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 448 A.2d 1317 (1982); *Strutner v. Dispatch Printing Co.*, 2 Ohio App.3d 377, 442 N.E.2d 129 (1982); Restatement (Second) of Torts § 652E comment a (1977). Additionally, "[i]n a false light privacy action, as in a defamation action, a court should not consider words or elements in isolation, but should view them in the context of the whole article to determine if they constitute an invasion of privacy." *Rinsley v. Brandt*, 700 F.2d at 1310. Therefore, courts and commentators have consistently treated false light privacy claims in essentially the same manner as they have treated defamation. *See* Emerson, *The Right of Privacy and Freedom of the Press, supra* at 333; Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. 1205, 1207 (1976); Bloustein, *The First Amendment and Privacy: The Supreme Court Justice and the Philospher*, 28 Rutgers L.Rev. 41, 91 (1974); Comment, *Privacy: The Search for a Standard*, 11 Wake Forest L.Rev. 659, 660–65 (1975).

 Despite the similarities between defamation and false light causes of action, there are also a number of important differences. First, "each action protects different interests: privacy actions involve injuries to emotions and mental suffering, while defamation actions involve injury to reputation." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. at 120 n. 19, 448 A.2d at 1329 n. 19; *see also Rinsley v. Brandt*, 700 F.2d at 1307; *Time, Inc. v. Hill*, 385 U.S. 374, 384 n. 9, 87 S.Ct. 534, 540 n. 9, 17 L.Ed.2d 456, 465 n. 9 (1967); *Froelich v. Adair*, 213 Kan. 357, 360, 516 P.2d 993, 996 (1973). Second, "[t]he false light need not be defamatory, although it often is, but it must be such as to be offensive to a reasonable person."

*Williams v. American Broadcasting Companies, Inc.*, 96 F.R.D. 658, 669 (W.D.Ark. 1983); *see also Time, Inc. v. Hill*, 385 U.S. at 384 n. 9, 87 S.Ct. at 540 n. 9, 17 L.Ed.2d at 465 n. 9; *Machleder v. Diaz*, 538 F.Supp. 1364, 1375 (S.D.N.Y.1982); *Uhl v. Columbia Broadcasting Systems, Inc.*, 476 F.Supp. 1134, 1139 (W.D.Pa.1979); *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 888 n. 9 (Ky.1981). Finally, although widespread publicity is not necessarily required for recovery under a defamation cause of action, it is an essential ingredient to any false light invasion of privacy claim. *See* Note, *False Light: Invasion of Privacy?*, 15 Tulsa L.J. 113, 132 (1979); *see also Meeropol v. Nizer*, 381 F.Supp. 29 (S.D.N.Y.1974); *aff'd in part rev'd in part*, 560 F.2d 1061 (2d Cir.1977); *Vogel v. W.T. Grant Co.*, 458 Pa. 124, 327 A.2d 133 (1974); *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 217 N.E.2d 736 (1966). Therefore, false light invasion of privacy is a distinct theory of recovery entitled to separate consideration and analysis.

The United States Supreme Court first considered false light invasions of privacy in *Time, Inc. v. Hill, supra.* There, in analyzing New York's statutory right of privacy in light of important first amendment considerations, it held that, "the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." 385 U.S. at 387–88, 87 S.Ct. at 542, 17 L.Ed.2d at 467. Therefore, the Court held that when matters of "public interest" are involved, the *New York Times* "actual malice" standard is applicable in invasion of privacy actions. Subsequent decisions by the United States Supreme Court indicate, however, that the *Hill* "actual malice" requirement is no longer applicable in privacy actions, at least where private individuals are involved.

 Shortly after its decision in *Hill*, the Court in *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094

(1967), utilized the *Hill* "public interest" analysis to extend the *New York Times* "actual malice" requirement to cases involving public *figures* as well as public officials. Later, in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the Court's protection of media defendants from defamation liability reached its apex when it again used the *Hill* public interest analysis to extend the *New York Times* rule to private individuals in certain circumstances. Shortly thereafter, however, as the Court began its gradual shift away from its staunch protection of the media, and returned to a more status oriented approach, it held in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789, 810 (1974), that, "Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times.*" Therefore, a private individual need only show negligence in an action for defamation against a media defendant in the absence of an otherwise privileged communication. *See Havalunch, Inc. v. Mazza, supra.*

In *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974) and *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court avoided the opportunity to address the issue of whether *Gertz* had, in effect, overruled *Hill* to the extent of requiring "actual malice" in privacy cases involving private individuals. In *Cantrell*, the Court consciously abstained from addressing the validity of *Hill* by finding "actual malice" to be present as a matter of fact, thereby negating the necessity of deciding whether a lesser degree of fault would be sufficient. In *Cohn* the Court again managed to avoid the issue since the information published was a matter of public record, and therefore was absolutely privileged.

Section 652E of the Restatement (Second) of Torts (1977) retains the *Hill* approach, it provides that a false light invasion of privacy occurs if "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." In a caveat to this section, however, the American Law Institute states,

> The Institute takes no position on whether there are any circumstances under which recovery can be obtained under this Section if the actor did not know of or act with reckless disregard as to the falsity of the matter publicized and the false light in which the other would be placed but was negligent in regard to these matters.

Expanding upon the uncertainty in this area of the law, comment d to this section states, "The effect of the *Gertz* decision upon the holding in ... *Hill* has ... been left in a state of uncertainty .... If *Time v. Hill* is modified along the lines of *Gertz v. Robert Welch*, then the reckless-disregard rule would apparently apply [only] if the plaintiff is a public official or public figure and the negligence rule will apply to other plaintiffs." Although a number of courts have applied the Restatement rule, few have given any consideration to the constitutional issues involved in determining the degree of fault required. *See, e.g., Rinsley v. Brandt*, 700 F.2d 1304; *Varnish v. Best Medium Pub. Co.*, 405 F.2d 608 (2d Cir.1968); *Logan v. District of Columbia*, 447 F.Supp. 1328 (D.D.C.1978); *Renwick v. News and Observer Pub. Co., supra; Goodrich v. Waterbury Republican-American, Inc., supra; Gill v. Snow*, 644 S.W.2d 222 (Tex.App.1982); *McCormack v. Oklahoma Pub. Co.*, 613 P.2d 737 (Okl.1980); *Dodrill v. Arkansas Democrat Co.*, 590 S.W.2d 840 (Ark.1979); *Harrison v. Washington Post Co.*, 391 A.2d 781 (D.C.App.1978).

Despite this unwillingness on the part of the majority of jurisdictions and the Restatement to recognize the invalidity of *Hill* in light of *Gertz*, several commentators and at least one federal district court have concluded that the "actual malice"

standard no longer applies to privacy actions involving private individuals. *See* Lehmann, *Triangulating the Limits on the Tort of Invasion of Privacy*, 3 Hastings Const.L.Q. 543, 593 (1976); Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. at 1274; Phillips, *Defamation, Invasion of Privacy, and the Constitutional Standard of Care*, 16 Santa Clara L.Rev. 77, 99 (1975); *Rinsley v. Brandt*, 446 F.Supp. at 856 ("This Court concludes that because of the strong similarity between a false light claim and a defamation claim, the *Gertz* rule will replace the *Hill* rule in the area of false light privacy."); *see also Uhl v. Columbia Broadcasting Systems, Inc., supra* at 1141 (rejecting the *Hill* rule in favor of a common law malice standard).

*Cantrell* and *Cohn* notwithstanding, subsequent Supreme Court decisions are indicative of the trend towards moving away from *Hill*. In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. at 571–75, 97 S.Ct. at 2855–57, 53 L.Ed.2d at 973–76, the Supreme Court emphasized the striking similarities between false light and defamation actions in holding that the *Hill* standard does not apply to non-false light "right of publicity" actions. In *Time, Inc. v. Firestone*, 424 U.S. 448 at 452–57, 96 S.Ct. 958 at 964–67, 47 L.Ed.2d 154 at 162–65 (1976), the Court downplayed the role of the first amendment in defamation actions where private individuals are involved in holding that a prominent socialite, involved in a celebrated divorce, who had held news conferences about the divorce proceedings, was not a public figure, and could recover for emotional distress caused by the alleged false defamatory statements.

■ Due to the pronounced overlap of defamation and false light invasion of privacy, particularly in the area of their first amendment implications, we conclude that the existing inconsistency between *Hill* and *Gertz* will eventually be resolved in favor of *Gertz*. In the absence of a privileged communication, the test to be applied in a false light invasion of privacy action by a private individual against a media defendant is what a reasonably prudent person would have done under the same or similar circumstances. Of course, as in defamation actions, if a privileged communication is involved, the "actual malice" or abuse of privilege standard will apply.

■ This negligence standard need not present any potential for a "chilling effect" on the press. First, as the United States Supreme Court stated in *New York Times*, 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701, we have a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open …." Therefore, when public officials, public figures, or legitimate matters of public interest are involved, plaintiffs may recover only upon proof of knowledge of falsity or reckless disregard for the truth. *New York Times, supra; Hill, supra;* and *Curtis Pub. Co., supra.* Second, the price of the license granted by the first amendment to the press to engage in robust activity is the necessity of every citizen of having some thickness of skin. Therefore, a plaintiff in a false light invasion of privacy action may not recover unless the false light in which he was placed would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652E(a) (1977). This requirement ensures that liability will not attach for the publication of information so innocuous that notice of potential harm would not be present. The childhood idiom "sticks and stones may break my bones, but names can never hurt me" provides a cultural sense of the community standard on de minimus misrepresentations. Third, the recognition of retraction or apology [8] as mitigating factors in the assessment of damages furnishes media defendants with an institutional mechanism for avoiding or minimizing unnecessary liability. Finally, when a media defendant is involved in a privacy action, the "reasonably prudent

---

**8.** Professional newspersons owe complaining parties in appropriate circumstances a duty to prepare the retractions or apologies and to secure their approval of their content. Otherwise, the retraction or apology published may only serve to exacerbate the harm which has already resulted from the initial publication.

person" standard becomes, in effect, a "liberal professional newsperson" standard. The "same or similar circumstances" portion of this test will allow a media defendant to interject such considerations as "chilling effect," the need for robusticity, standards within the profession, and the role of the press in society. All of these factors contribute to our determination that negligence, indeed, is the proper standard to be applied when a nonprivileged false light action by a private individual is involved.

■■■■ Turning to the facts surrounding the present case, it is clear that genuine issues of material fact remain which preclude the granting of summary judgment for the defendant on the false light invasion of privacy cause of action. First, as in the appellant's defamation cause of action, whether the statements in the article involved referred to the appellant with regards to her privacy cause of action is a question of fact for the jury. Second, when the communication involved in a false light case does not clearly favor one construction over another, the determination of what light it places the plaintiff is for the jury. *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026 (5th Cir.1982); *Pierson v. News Group Publications, Inc.*, 549 F.Supp. 635 (S.D.Ga.1982). This consideration is related to the first in that the key factual issue upon remand is whether the article implied that Crump had suffered harassment in the course of her employment, thereby either defaming her or placing her in a false light before the public. Finally, the issue of abuse of privilege, as in the defamation portion of the appellant's action, will be an issue for the jury in the false light portion if the trial court finds upon remand that a qualified privilege or privileges existed.

Accordingly, the trial court's order granting summary judgment for the defendant is reversed, and the plaintiff's defamation and false light causes of action are remanded for a trial on the merits.

Reversed and remanded.

NEELY, Justice concurring in part and dissenting in part.

Gimbel is said to have remarked once that he knew half of his advertising budget was wasted, but he didn't know which half. I am faced with a similar predicament in reading the majority's daunting opinion in this relatively straightforward case. I am fairly certain that ninety percent of what has been written here is unnecessary, but I am hard pressed to find the ten percent that is germane.

Perhaps verbosity is an occupational hazard and there is a real danger in tossing around stones within the crystalline judicial chambers. Nevertheless, it is troubling to read an opinion that purports to set out mankind's thoughts on the issue of libel from the time of Moses (who apparently believed the crime involved but a single element) to that of Brooke Shields (whose opinion as to the necessary elements has apparently not yet been articulated). The danger is not simply that overworked lawyers will be required to pore through material that is of little or no use to them, although that in itself is a considerable burden. The real danger is that in trying to lay out all of the law in a complex field, it is inevitable that some misstatements will be made.

For example, Syllabus Point 10 of the majority opinion states: "The protection afforded by the law of privacy is restricted to persons of ordinary or reasonable sensibilities, and does not extend to the supersensitive." This is a clear misstatement of the law. All citizens are protected by the law from unreasonable invasions of privacy. It is not a defense to demonstrate that a particular individual is "supersensitive." If a supersensitive individual is injured by a statement that would have offended the sensibilities of the reasonable man, that supersensitive individual is entitled to recovery. Although the standard of reasonableness is an objective one, the issue is whether the particular statement or photograph constitutes an unreasonable invasion of privacy; it is not whether the harmed individual would have felt injured by a statement that would not have been injuri-

ous to the reasonable man. Therefore, I dissent from today's ruling to the extent to which it defines invasion of privacy as excluding a class of individuals rather than a class of particular claims.

I am also confused by an inconsistency in the majority's approach to different legal theories of recovery. When dealing with the appropriation theory, the majority states as an uncontradicted fact that, "Crump's photograph was not published because it was *her* likeness it was published because it was the likeness of a woman coal miner." Therefore, the majority holds as a matter of law that Crump is not entitled to recovery under an appropriation theory. Turning to the false light theory, the majority states that whether the statements in the article referred to the appellant individually is a question of fact for the jury. This is blatantly inconsistent. If the statements and picture relate to a general female coal miner and not the individual plaintiff, no issue is left for the jury. Something that is a fact regarding one legal theory is a fact. It cannot be miraculously transformed into a "question for the jury" simply by attaching a different label to the legal theory of recovery.

The disturbing thing about this confusion is that it is simply unnecessary. This case comes before us on a motion for summary judgment. West Virginia has a long history of disfavoring such motions as a method for disposition of cases where genuine issues of material fact remain, Syl.Pt. 6, *Johnson v. Junior Pocahontas Coal Co., Inc.*, 160 W.Va. 261, 234 S.E.2d 309 (1977), or where different inferences can be drawn from facts that are accepted as true, *Aetna Casualty and Surety Company v. Federal Insurance Company of New York*, 148 W.Va. 160, 171, 133 S.E.2d 770, 779 (1963). We have also noted that "summary judgments should be entertained and granted with due restraint in civil actions involving issues of negligence ...." *Anderson v. Turner*, 155 W.Va. 283, 296, 184 S.E.2d 304, 313 (1971). Similarly, in *Hutchinson v. Proxmire*, 443 U.S. 111, 120 fn. 9, 99 S.Ct. 2675, 2680 fn. 9, 61 L.Ed.2d 411 (1979), Chief Justice Burger indicated that the use of summary judgment motions in

libel cases should not be favored. All that was necessary for our decision in this case was to recognize that some factual questions remained unanswered and that a trial would develop a sufficient record for the determination of legal issues. Attempting to answer those legal questions in a factual vacuum is difficult at best and foolhardy at worst.

This opinion is an example of the "More is Better" philosophy. The majority tells us that at the time Moses returned with his sacred tablets, libel consisted of the single element of falsehood. Today the majority refines the definition so that there are now six elements to that offense. What progress we have made! Think of the improvements that can be grafted on to the other nine commandments.

Of course the ancient edict against lying has little more to do with the modern law of defamation than the miracle of the loaves and fishes has to do with the current proscriptions against selling food without a vending license. If the majority wish to look to the Bible for guidance in writing their future opinions I would suggest instead that they turn to the Book of Proverbs where they would find the sage advice in Chapter 17, Verse 28:

> Even a fool, when he holdeth his peace, is counted wise: and he that shutteth his lips is esteemed a man of understanding.